COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Moon, Judges Fitzpatrick and Annunziata
Argued at Salem, Virginia


GREGORY WILLIAM WILSON
                                             OPINION BY
v.         Record No. 2062-95-3     CHIEF JUDGE NORMAN K. MOON
                                            JULY 22, 1997
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF BRISTOL
                    Charles B. Flannagan, II, Judge

              Russell Vern Presley, II (Street, Street,
              Street, Scott & Bowman, on briefs), for
              appellant.

              John H. McLees, Jr., Assistant Attorney
              General (James S. Gilmore, III, Attorney
              General, on brief), for appellee.


     Gregory William Wilson appeals his convictions of second

degree murder, malicious wounding and two counts of use of a

firearm in the commission of a felony.  Wilson asserts that the

trial court: (1) erred in failing to find that the Commonwealth

had suppressed exculpatory evidence consisting of the pretrial

statements of Pamela Statzer, Dawn Chapman, and Melissa Wilson;

(2) abused its discretion by failing to require the Commonwealth

to produce before trial or before cross-examination a written

statement used to impeach Melissa Wilson ("Mrs. Wilson"); (3)

erred in refusing Wilson's proposed jury instruction "C" on the

right to arm for self-protection; (4) erred in refusing Wilson's

proposed jury instruction "F" concerning self-defense; and (5)

erred in denying Wilson's motion for a mistrial or in the

alternative a new trial based on the alleged after-discovered

evidence and witness misconduct.

We hold that: (1) the record does not support a finding that the undisclosed statements of Statzer, Chapman, and Mrs. Wilson presented the reasonable probability that, had they been disclosed to the defense, the result of the trial would have been different; (2) Wilson failed to properly preserve his argument that the trial court abused its discretion in refusing to require the Commonwealth to produce the written statement used to impeach Mrs. Wilson; (3) Wilson's proposed instruction "C" on the right to arm for self-protection was properly refused because it was unsupported by the evidence; (4) Wilson's proposed instruction "F" was properly refused because it was repetitive of the other instructions which addressed the same legal principle; and (5) the trial court did not err in denying Wilson's motion for a mistrial or in the alternative a new trial because the after-discovered evidence presented by Wilson did not support a finding that the new evidence would have produced a different result at another trial.

### Facts

At approximately 11:00 p.m. on January 13, 1995, Wilson and Emmit Powers arrived at Pamela Statzer's apartment, located at 700 Russell Street in Bristol, Virginia. Wilson's estranged wife and Wilson's three children lived with Statzer and her three children. Wilson and Powers arrived at approximately the same time that Jeffrey Hawkins, Bradley Moore, and Virginia Dawn

2

Chapman came to visit Statzer. Wilson spoke with Statzer at the door for a few moments and then left, explaining that he was going to get his car and would return to talk with his wife and children. Statzer agreed to permit the visit, provided there was no "trouble."

Wilson returned fifteen minutes later and joined Statzer, Mrs. Wilson, Hawkins, Moore, and Chapman, who were in the living room talking and drinking. Another person, James Brock, who had arrived at Statzer's apartment intoxicated, was asleep on the floor in the bedroom of Statzer's sons. Statzer testified that after Wilson returned, Hawkins, who was angry with Brock, went to the bedroom intending to wake him. Wilson testified that Hawkins entered the room and kicked Brock in the head. Wilson stated that he asked Hawkins not to bother Brock and that he and Statzer convinced Hawkins to leave the room. Statzer, Wilson, and Hawkins then returned to the living room. At trial Statzer testified that she did not see Hawkins kick Brock, but that Hawkins had stated that he wanted to wake Brock to "settle something with him." Brock testified that he remained asleep until the police arrived and that consequently, he was unaware of any of the incidents that occurred during the course of the evening.

Statzer's and Chapman's testimony regarding the circumstances surrounding the subsequent events differed from the version testified to by Wilson and his wife. Statzer and Chapman

3

stated that Wilson accused Moore of having a weapon and that Moore, who was very intoxicated, stood and removed several shirts in order to prove to Wilson that he was unarmed. Hawkins insisted that Moore was unarmed and that Wilson and Hawkins argued. Hawkins eventually shoved Wilson, causing him to fall backward into a window, breaking the interior pane but not the exterior storm pane. Statzer testified that Wilson was in no danger of falling out of the window.

Wilson recovered from the fall, and as he did so, pulled a gun from behind him and shot Hawkins four times in rapid succession. After the first shot, Statzer went to retrieve her children, and as she got up, she saw Wilson shoot Moore while he was still seated. Statzer also stated that Moore had been so intoxicated that he could barely stand. Moore testified that because he had consumed so much alcohol on the night that he was shot, he did not remember being shot or the events preceding the shooting.

The Wilsons offered a different version of these events. Wilson testified that he had been shooting debris with a friend earlier in the day and that he had brought the gun into Statzer's apartment because he feared it might be stolen from his car. Wilson and his wife testified that an argument occurred between Hawkins and Wilson and that Wilson was preparing to leave when Hawkins grabbed Wilson and threw him toward the window as hard as possible. They stated that after Wilson shot Hawkins, Moore

4

stood and was attempting to block Wilson's exit when Wilson shot him. Wilson fled the apartment after the shooting and drove through a low cinder block wall in front of the apartment as he sped away.

When the police arrived at Statzer's apartment, they found Hawkins lying on the living room floor. He had been shot in the face, the neck, the left ear, and the upper abdomen. Moore was also lying on the floor and was calling for help. He had been shot in the right chin, the left shoulder, and the lower back.

The investigating officers took statements from the witnesses, including a written statement from Mrs. Wilson, a written statement from Chapman, and two written statements from Statzer. Statzer also gave an additional written statement on January 19, 1995. Wilson's court-appointed private investigator also took statements from Statzer and Chapman. During the course of interviewing Statzer, the investigator learned that she had given the two additional statements to the police. However, no effort was made by Wilson to obtain these additional statements. At trial, Mrs. Wilson's statement was used by the Commonwealth to impeach her testimony. Wilson's counsel objected to the use of the statement, arguing that the Commonwealth had not shown the statement to Mrs. Wilson before cross-examining her regarding its contents.

After the trial, Wilson learned for the first time that Chapman had made an undisclosed statement. In addition, Powers,

5

who had testified for the Commonwealth, informed Wilson that while waiting to testify, he had overheard a conversation between Chapman and Statzer. Statzer allegedly stated that she had not actually seen the shooting and questioned her ability to testify to the events in question. Chapman allegedly reassured Statzer and coached her regarding what had happened during the shooting.

Wilson's counsel filed a motion for a mistrial or in the alternative a new trial, arguing that by withholding the written statements made by Statzer, Chapman, and Mrs. Wilson, the Commonwealth had failed to comply with the trial court's May 19, 1995 order requiring the Commonwealth to disclose any exculpatory evidence. Wilson asserted that all four statements contained exculpatory evidence because each statement "contained information concerning Hawkins' aggression or provocation which supported Wilson's theory of self-defense."

At a hearing on Wilson's motion, the trial court reviewed <u>in camera</u> the undisclosed statements made by Chapman and Statzer. Although the trial judge found minor inconsistencies between the statements and the testimony at trial, he concluded that the differences were not material. Regarding the assertion concerning newly discovered evidence, the trial judge did not hear live testimony by Powers, and instead, considered a transcript of Powers' interview with the defense's investigator and the written statements of the other witnesses. Based on his determination that there were no material differences in

6

Statzer's statements and her trial testimony, the judge found that there had been no prejudice to Wilson's defense and, therefore, denied Wilson's motion.

## Exculpatory Evidence

Brady v. Maryland, 373 U.S. 83 (1963), recognizes the prosecution's duty to disclose to an accused exculpatory evidence which is material to guilt or punishment. "Exculpatory evidence is material if there is a reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. A `reasonable probability' is one which is sufficient to undermine confidence in the outcome of the proceeding." Bowman v. Commonwealth, 248 Va. 130, 133, 445 S.E.2d 110, 112 (1994) (citing United States v. Bagley, 473 U.S. 667, 682 (1985); Robinson v. Commonwealth, 231 Va. 142, 151, 341 S.E.2d 159, 164 (1986)); see also Humes v. Commonwealth, 12 Va. App. 1140, 1143, 408 S.E.2d 553, 555 (1991).

Here, the trial judge reviewed in camera the pretrial statements and determined that there were no material differences. The record establishes that the testimony of Statzer and Chapman was consistent with their pretrial statements, and consequently that there was no reasonable probability that the outcome of Wilson's trial would have been different had the statements been disclosed to the defense before trial.

Statzer's and Chapman's testimony concerning the sequence of events during the course of the evening was substantially identical to their statements and to Wilson's testimony. Statzer, Chapman, and Wilson testified that Hawkins pushed Wilson

8

before Wilson fired on him.  They also indicated that the interior window pane was broken when Wilson fell into the window.  At trial, Statzer and Chapman stated they believed that the push or shove was "slight."  Neither Statzer's nor Chapman's statements indicated that the push was slight.  Their undisclosed statements merely indicated that Hawkins had shoved Wilson, without qualifying the severity of the push.

Wilson's claim that Statzer's pretrial statements corroborated his statement that Hawkins acted aggressively toward Brock is unsupported by the record.  In the undisclosed statements Statzer told police:

> Jeff Hawkins asked where James Brock was.  I told him he was asleep in my son's bedroom. Jeff Hawkins and Greg Wilson walked into the bedroom and flipped on the light.  Hawkins and Wilson began arguing. . . .  I went across the room and got Greg and Jeff to come out of my son's room.
>
> Jeff said where is James Brock.  I asked why and said noone is going to bother James cause he's been asleep a [sic] hour or so in the boys floor on a sleeping bag.  So Jeff goes to the boys room + turned the light on which Greg was right behind him.  Greg told Jeff to not bother James cause he was asleep + my boys were in there too asleep.  So I got out of my chair + talked to them and got them to come back into the living room.

In the statement which was disclosed to the defense, Statzer provided details that were in fact more favorable to the defense than those contained in her undisclosed statements:

> Everyone was setting [sic] in the living room for about 30 minutes, when Jeff asked where James Brock was and Ms. Statzer said in the bedroom sleeping in the floor, where her kids

9

were sleeping.  She (Statzer) said why, Jeff Hawkins said he was going to hurt James. [Wilson] told Jeff if he had a problem with James to settle it later that there were 6 kids in the house.

Similarly, Statzer's statement to the defense investigator was consistent with her previous statements and more favorable to the defense than her two undisclosed statements:

Yea, there was one argument.  Jeff said he was going to whoop [Brock's] butt.  Greg got all bent out about it.  Before he said it [blank space] wooden door and I walked up to [blank space] and turned the light out and me and my boys [blank space] and Greg came [blank space] I said No Greg you all come on. I got them out of there and then they came back in the living room and everybody said they were arguing about a tape or something, but I never heard them arguing about no [sic] tape.

Statzer's trial testimony was not as favorable as her two disclosed statements, but both the more favorable undisclosed statements were available to the defense and could have been used to impeach Statzer.

Wilson further claimed that Statzer's undisclosed statements corroborated his assertion that Moore was hostile, that he had stood up behind Hawkins, and that Wilson shot Moore in self-defense.  Statzer testified "that Moore stayed in his chair the entire evening because he was too drunk," and that "she never saw Moore do anything aggressive to Wilson or anyone else."  In her undisclosed statements, Statzer indicated that "[Moore] was real drunk and I felt he was going to start arguing also," and that at the time that Wilson and Hawkins were in her sons'

10

bedroom, that "[w]hen I was standing there with [Wilson] and [Hawkins], [Moore] got up barely and come by me.  But I talked [Moore] into sitting back down."  At trial Wilson advanced the theory that Moore had actually stood up behind Hawkins and then blocked Wilson's exit.  Nothing contained in Statzer's undisclosed statements supports this assertion, nor do they materially contradict her trial testimony.  Consequently, we conclude that the record does not support a finding that there was a reasonable probability that if Statzer's statements had been disclosed, the outcome of the trial would have been different.

Regarding Chapman's undisclosed statement, Wilson first asserted that it would have served to contradict Statzer's testimony that Moore did nothing aggressive while at Statzer's apartment.  The record fails to support this assertion.

Chapman's statement, in relevant part, provided that,
> [e]verything went along real fine for a while until Jeff Hawkins and Greg Wilson got into a loud argument.  I saw Brad Moore take off at least two shirts.  Brad told Greg, man I ain't got nothing.  He repeated again.  After this some more words were exchanged between Jeff Hawkins and Greg Wilson.

Nothing in Chapman's statement supports a finding that Moore was hostile or aggressive during the altercation between Hawkins and Wilson.  Wilson also asserts that Chapman's statement would have supported Wilson's theory that Hawkins acted aggressively. However, Chapman testified at trial that an argument occurred and

11

furthermore, the undisclosed statements and testimony of both Statzer and Chapman are consistent in suggesting that Wilson caused the argument.

Finally, Wilson also contends that Chapman's statement did not indicate that Chapman saw Wilson shoot Moore while Moore was still seated. Chapman testified that after Wilson first shot Hawkins, she fled to get the police, rendering it unlikely that she would have been able to comment on when or how Moore was shot. Furthermore, even if Statzer's undisclosed statements had supported Wilson's version of the facts, such evidence would not have been exculpatory. Wilson's argument that he shot Moore three times because Moore got up from his chair, stood behind Hawkins, and then blocked Wilson's exit, does not support a theory of self-defense. Accordingly, we hold there is no reasonable probability of a different outcome had Chapman's statement been disclosed, and therefore hold that the statement was not exculpatory.

Mrs. Wilson's undisclosed statement was similar to Wilson's trial testimony. She stated that Hawkins pushed Wilson against the window and broke it. At trial, however, Mrs. Wilson's testimony contradicted her written statement and consequently, her statement was used to impeach her. Compared with her testimony at trial, her undisclosed statement was inculpatory not exculpatory. Accordingly, we hold that the record did not support a finding that a reasonable probability existed that a

12

different outcome would have resulted had the Commonwealth disclosed Mrs. Wilson's statement.

## Impeachment of Mrs. Wilson

Wilson argues that the trial court erred in not requiring the Commonwealth, under Code § 19.2-268.1, to produce the inconsistent writing used to impeach Mrs. Wilson. Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling . . . ." McQuinn v. Commonwealth, 20 Va. App. 753, 755, 460 S.E.2d 624, 626 (1995) (en banc). Wilson failed to properly raise the issue at trial, and Rule 5A:18 now bars our consideration of the matter. Wilson also failed to raise the issue in his petition for appeal, and thus the matter is likewise barred under Rule 5A:12(c).

## Instruction "C" - Right to Arm for Self-protection

"`Both the Commonwealth and the defendant are entitled to appropriate instructions to the jury of the law applicable to each version of the case, provided such instructions are based upon the evidence adduced.'" Stewart v. Commonwealth, 10 Va. App. 563, 570, 394 S.E.2d 509, 514 (1990) (citation omitted). Here, the trial court refused instruction C, which stated that if a person reasonably apprehends that another intends to kill him or seriously injure him, the person "has a right to arm himself for his own necessary self-protection, and in such case, no inference of malice can be drawn from the fact that he prepared for it."

14

"An instruction is properly refused when it is unsupported by the evidence." Bennett v. Commonwealth, 8 Va. App. 228, 234, 380 S.E.2d 17, 21 (1989). Here, the evidence demonstrated that Wilson armed himself long before he entered the apartment, argued with Jeff Hawkins, or possibly could have perceived that Hawkins intended him harm. There was no evidence that Wilson armed himself in reaction to a threat from Hawkins. In fact, Wilson testified that he brought the gun into Statzer's apartment because he feared that it would be stolen from his car. Thus, instruction C was inapplicable to the facts of the case, and the trial court did not err in refusing it.

### Instruction "F" – Self-defense

"When one instruction correctly states the law, the trial court does not abuse its discretion by refusing multiple instructions upon the same legal principle." Cirios v. Commonwealth, 7 Va. App. 292, 303-04, 373 S.E.2d 164, 170 (1988). The principles pertaining to self-defense set forth in instruction F were contained in instructions E and G. The only information contained in instruction F not included in either instruction E or G was characterization of one of the alternative verdicts as "excusable" homicide. Specific use of the term "excusable" was not required, however, as the underlying concepts were clearly and fairly presented in the other instructions. Therefore, the trial court did not err in refusing instruction F where it granted instructions E and G.

15

<u>Newly Discovered Evidence</u>

Four requirements must be met for a new trial to be granted upon a claim of newly discovered evidence:  "(1) the evidence was discovered after trial; (2) it could not have been obtained prior to trial through the exercise of reasonable diligence; (3) it is not merely cumulative, corroborative or collateral; and (4) is material, and as such, should produce an opposite result on the merits at another trial."  <u>Mundy v. Commonwealth</u>, 11 Va. App. 461, 480, 390 S.E.2d 525, 535, <u>aff'd on rehearing en banc</u>, 399 S.E.2d 29 (1990), <u>cert. denied</u>, 502 U.S. 840 (1991).  The burden is on the proponent of after-discovered evidence to show that all requirements have been met in order to justify the granting of a new trial.  <u>Carter v. Commonwealth</u>, 10 Va. App. 507, 512-13, 393 S.E.2d 639, 642 (1990).  The granting of such a motion is addressed to the sound discretion of the trial court and that decision will not be reversed absent an abuse of discretion. <u>Mundy</u>, 11 Va. App. at 481, 390 S.E.2d at 536.

After trial, Wilson alleged that Statzer and Chapman discussed their testimony while secluded in the witness room and that Chapman coached Statzer as to what testimony she should give.  The alleged conversation was overheard by Powers, a witness called by the Commonwealth.  A transcript of Powers' interview with the defense's investigator was attached as an exhibit to Wilson's motion for a new trial.  Powers stated that:

> It was more like two women sitting here
> discussing the whole thing and one of them
> [Statzer] saying well I didn't really see

16

anything.  I had to get up and run grab my kids, and I was in the kitchen and this that and the other and I was so messed up I didn't know where I was.  And she [Chapman] says well you know you saw him do this that and the other.  And that's basically what it was.  They set there like that for an hour, an hour and a half with me and my wife both sitting there listening.

The trial court reviewed in camera Powers' interview, Statzer's trial testimony, and the written statements Statzer made shortly after the shootings.  The court concluded, and the record demonstrated, that Statzer's statements did not differ materially from her testimony at trial.  Thus, there is no evidence that, even if the conversation between Statzer and Chapman occurred, Statzer's testimony was affected.  Because the record does not support a finding that the after-discovered evidence would have produced a different result at another trial, the trial court did not abuse its discretion in denying appellant's motion for a new trial.

Further, at the hearing on post-trial motions, the trial court stated that, in light of the exhibits previously filed by appellant, which included a transcript of Powers' interview, it was not necessary for appellant to present further evidence.  The court said that if Powers possessed information beyond that contained in the documents, he would be permitted to testify.  Wilson did not object to this procedure and did not call Powers as a witness.

Wilson argues, however, that the trial court erroneously

17

excluded the testimony of Powers.  Wilson failed to properly raise the issue at trial, and Rule 5A:18 bars our consideration of the matter on appeal.

Holding that the trial court did not err in finding that the undisclosed written statements did not present the reasonable probability that, had they been disclosed to the defense, the result of the trial would have been different, that the trial court did not err in denying Wilson's motion for a mistrial or in the alternative a new trial on the basis of newly discovered evidence, and that the trial did not err in refusing Wilson's instructions C or F, we affirm.

<u>Affirmed.</u>

18