COURT OF APPEALS OF VIRGINIA


Present:  Judges Willis, Bray and Annunziata
Argued at Norfolk, Virginia


ELLIOTT JEROME HAWTHORNE

MEMORANDUM OPINION[*] BY
v.          Record No. 1455-98-1          JUDGE RICHARD S. BRAY
                                        JUNE 29, 1999
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                      Everett A. Martin, Jr., Judge

              J. Barry McCracken (Cook & McCracken, on
              brief), for appellant.

              Kathleen B. Martin, Assistant Attorney
              General (Mark L. Earley, Attorney General,
              on brief), for appellee.


     Elliott Jerome Hawthorne (defendant) was convicted by a

jury of first-degree murder.  On appeal, defendant contends that

the trial court erroneously (1) overruled his Batson challenge

to the Commonwealth's peremptory strikes of African-Americans

from the venire, (2) instructed the jury on "concert of action,"

(3) refused instructions on self-defense and voluntary

manslaughter, and (4) coerced the jury into a verdict.  We

disagree and affirm the conviction.

     *Pursuant to Code § 17.1-413, recodifying Code § 17-116.010,
this opinion is not designated for publication.

The parties are fully conversant with the record, and this memorandum opinion recites only those facts necessary to a disposition of the appeal.

The pertinent evidence is substantially uncontroverted. David Defoe and Sherri Peterson shared an apartment in the Ocean View area of Norfolk with Frank Pritzer.  On the morning of the offense, Defoe and Pritzer walked "around the corner" to the apartment of defendant's brother, Keith Hawthorne, to purchase cocaine.  Pritzer soon returned and advised Peterson "that [Defoe] had broke into [the] house."  Minutes later, Peterson "heard a gunshot" and "saw [Defoe] running down the street" with "an armful of things," "look[ing] scared."  Arriving at the apartment, Defoe instructed Peterson "to meet him on 14th Bay[] [a]nd . . . took off running."  Before Peterson could rendezvous with Defoe, however, Keith Hawthorne, appearing "mad," "stopped by . . . looking for [Defoe]," prompting Peterson to wait until "it was okay to go to where [Defoe] was without anybody following."

After "about 20 minutes," Peterson proceeded to an apartment at 14th Bay and "went straight to the bedroom [where Defoe] had all of the things he had stolen kind of spread out on the bed . . . [including] three guns, a bag of weed," "some crack," and "a camcorder."  After "both did a hit of crack," they heard "banging" on the front door and voices "telling us to

open up." Defoe "grabbed the crack," the pistol that "had a clip in it," "ran into the bathroom and jumped in the bathtub behind the shower curtain." Meanwhile, Peterson concealed the spoils and "jumped on the loveseat trying to pretend like [she] was asleep." Moments later, three men, Keith Hawthorne, Dee Washington, and defendant, "kicked . . . open" the entry and bedroom doors of the apartment, each brandishing a firearm. "They . . . pointed their guns at [Peterson], told [her] to get up and open the closet door." When "they saw [Defoe] wasn't in the closet they went directly to the bathroom door, . . . kicked [it] open [and] told [Peterson] to go."

Peterson moved into the living room area and immediately heard someone direct Defoe "to put the gun down," followed by "some gunshots." Keith Hawthorne then "ran out of the bedroom, . . . out the back door, around to the bathroom window," and Peterson heard "more gunshots." Hawthorne returned to the bathroom, "more gunshots" sounded, and he and Washington "ran out the front door," leaving defendant alone in the bathroom with Defoe. Defoe then declared to defendant, "I'm talking to you man to man. Look at me. I'm bleeding," followed by two additional gunshots, and defendant fled from the apartment.

Investigator Jeffrey Allen Diener "[s]urveyed the [crime] scene" on the morning of the offense and noted that a "force on the [front] door [had] pulled the locked parts out." Diener

observed a ".25 caliber pistol . . . over by the window of the bathroom on the floor."  "The firearm had been fired[,] . . . [but] [f]or whatever reason[,] the weapon did not function properly . . . and eject the empty shell as it's supposed to."  Eight "9 millimeter shell casing[s]" were recovered from the bathroom, and "[t]here were two holes in the screen [of the bathroom window] . . . in the direction of travel . . . from the outside to the inside."  Defoe's body was in the bathtub, riddled with ten gunshot wounds at divers sites, fired from no fewer than two weapons.

At the conclusion of trial, defendant was convicted of first-degree murder, and this appeal followed.

## I.  Batson Challenge

Defendant first contends that the Commonwealth exercised peremptory strikes to remove two African-American venirepersons, Ms. Flyth and Ms. Wilkins, for discriminatory purposes, contrary to the mandate of Batson v. Kentucky, 476 U.S. 79 (1986).

"Batson dictates that purposeful discrimination based upon race in selecting jurors violates the Equal Protection Clause.  Once an accused makes a prima facie showing of such discrimination, a prosecutor must furnish a reasonable explanation in rebuttal, showing that the reason for the peremptory strike was race neutral."  Kasi v. Commonwealth, 256 Va. 407, 421, 508 S.E.2d 57, 65 (1998).  "A 'trial court's

decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal,' which should be disturbed only if 'clearly erroneous.'" Barksdale v. Commonwealth, 17 Va. App. 456, 460, 438 S.E.2d 761, 763 (1993) (en banc) (citations omitted). "Age, education, employment, and demeanor during voir dire may constitute race-neutral explanations for a peremptory strike." Goodson v. Commonwealth, 22 Va. App. 61, 81, 467 S.E.2d 848, 858 (1996) (citation omitted).

Here, in response to defendant's challenge, the prosecutor explained that she thought Ms. Flyth "was white . . . . [But,] [m]ore importantly, . . . she's the youngest person on the panel and [the Commonwealth] ha[s] had problems in the past with young jurors not wanting to listen to the arguments of older jurors." The prosecutor added that she had removed Ms. Wilkins, age twenty-four, for the "[s]ame type of reasons," noting that her employment in "telemarketing" differentiated her from another venireperson of similar age but "in a management position."

Assuming, without deciding, that defendant made a prima facie showing of purposeful discrimination, the record supports the trial court's determination that the Commonwealth offered "a race-neutral reason for the strikes." With regard to Ms. Flyth, defense counsel agreed "to give the Commonwealth the benefit of the doubt . . . simply because [the prosecutor] clearly made a

mistake," thereby conceding the issue.  See Johnson v.

Commonwealth, 26 Va. App. 674, 683, 496 S.E.2d 143, 147 (1998).

The prosecutor attributed the Wilkins strike to age and

employment, considerations clearly race-neutral and undisputed

by defendant.

II.  Jury Instructions

Defendant next complains that the trial court erroneously

instructed the jury on "concert of action," while refusing to

instruct on self-defense and voluntary manslaughter.

A.  Concert of Action

It is "well established that 'a defendant is entitled to

have the jury instructed only on those theories of the case that

are supported by the evidence,' and a trial court errs when it

refuses such an instruction that is supported by 'more than a

scintilla' of evidence."  Dalton v. Commonwealth, 29 Va. App.

316, 323-24, 512 S.E.2d 142, 145 (1999) (en banc) (citations

omitted).  "On appeal, when the issue is a refused jury

instruction, we view the evidence in the light most favorable to

the proponent of the instruction."  Lynn v. Commonwealth, 27 Va.

App. 336, 344, 499 S.E.2d 1, 4-5 (1998), aff'd, 257 Va. 239, 514

S.E.2d 147 (1999) (citation omitted).

Over defendant's objection, the trial court instructed the

jury:

> If there is concert of action with the
> resulting crime one of its incidental

- 6 -

probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

1 Model Jury Instructions, Criminal, No. 3.160 (1998 Repl. Ed.). "Concerted action is defined as 'action that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.'" Rollston v. Commonwealth, 11 Va. App. 535, 542, 399 S.E.2d 823, 827 (1991) (citation omitted). The instruction is "proper to use when any unlawful enterprise is intended" by the participants. Id. at 543-44, 399 S.E.2d at 828.

Here, defendant, his brother, and Washington, brandishing deadly weapons, forcibly entered the 14th Bay apartment in search of Defoe, obviously intent upon the recovery of articles stolen by Defoe from the brother. Collectively, they engaged in a murderous assault upon the victim, armed and hidden alone in the bathroom. Such conduct, together with other attendant circumstances, provided ample support for the fact finder to conclude that the three assailants entered the apartment in pursuit of an unlawful purpose and prepared for a violent encounter, clearly justifying a concert of action instruction.

B.  Self-defense

   "'An instruction is properly refused when it is unsupported by the evidence.'"  Wilson v. Commonwealth, 25 Va. App. 263, 274, 487 S.E.2d 857, 863 (1997) (citation omitted).  "[A] person cannot rely upon a plea of self-defense in a case of homicide or assault when he himself was the aggressor and wilfully [sic] brought on, without legal excuse, the necessity for the homicide or assault."  Jordan v. Commonwealth, 219 Va. 852, 855, 252 S.E.2d 323, 325 (1979); see Sims v. Commonwealth, 134 Va. 736, 760, 115 S.E. 382, 390 (1922).  Thus, defendant and his confederates, "clearly the aggressor[s] in the altercation," were precluded from reliance "upon self-defense or provocation . . . induced by [their] own belligerent behavior."  Huffman v. Commonwealth, 185 Va. 524, 528, 39 S.E.2d 291, 293 (1946) (citations omitted).  Accordingly, the trial court correctly declined to instruct the jury on the principles of self-defense.

C.  Voluntary Manslaughter

   "[A] trial court must instruct the jury on the lesser-included offense of voluntary manslaughter if the evidence of heat of passion and reasonable provocation amounts to 'more than a scintilla.'"  Turner v. Commonwealth, 23 Va. App. 270, 275, 476 S.E.2d 504, 507 (1996) (citation omitted), aff'd, 255 Va. 1, 492 S.E.2d 447 (1997), cert. denied, 118 S. Ct. 1852 (1998).  However,

> where the reviewing court is able to
> determine that the trial court's error in
> failing to instruct the jury could not have
> affected the verdict, that error is
> harmless. Such a determination can be made
> where it is evident from the verdict that
> the jury would have necessarily rejected the
> lesser-included offense on which it was not
> instructed.

Id. at 276, 476 S.E.2d at 507 (citations omitted).

"Murder" is the unlawful killing of another with malice. See Thomas v. Commonwealth, 186 Va. 131, 139, 41 S.E.2d 476, 480 (1947). "Manslaughter on the other hand, is the unlawful killing of another without malice." Barrett v. Commonwealth, 231 Va. 102, 105, 341 S.E.2d 190, 192 (1986) (citation omitted). In convicting defendant of first-degree murder, the jury found, beyond a reasonable doubt, that "the killing was willful, deliberate and premeditated," as properly defined in the instructions. Thus, "[t]he verdict reached by the jury . . . compels the conclusion that it would never have reached a voluntary manslaughter verdict . . . [because it] necessarily rejected the factual basis upon which it might have rendered a verdict on the lesser-included offense." Turner, 23 Va. App. at 277-78, 476 S.E.2d at 508 (citations omitted). Under such circumstances, any error which may have attended refusal of a voluntary manslaughter instruction was clearly harmless.

### III. Jury Coercion

Lastly, the defendant asserts that the trial court impermissibly coerced the jury into the verdict. Jury deliberations began at 2:40 p.m., recessed at 5:35 p.m., and resumed the following morning, after an "Allen charge" from the court. Subsequently, the jury notified the court that all jurors had "agreed on four criteria for offense. However, one jury [sic] did not want to convict the person of the crime of first-degree murder even though she agreed to all four criteria." The court then admonished the jury that "no Virginia judge may compel any Virginia juror to convict any defendant of any criminal offense. I will remind you though [you] took the oath to render a true verdict according to the evidence."

The jury had been previously instructed, "If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty of first-degree murder." The exchange in issue clearly revealed that the elements of first-degree murder had been proved to the satisfaction of the entire panel, and the court's comment only reminded the jury of earlier instructions, without hint of coercion or bias.

Accordingly, we affirm the conviction.

Affirmed.