COURT OF APPEALS OF VIRGINIA

Present:  Judges Baker, Bray and Overton
Argued at Norfolk, Virginia


BARRY THOMAS JOHNSON
                                          OPINION BY
v.        Record No. 1791-96-1     JUDGE JOSEPH E. BAKER
                                       FEBRUARY 24, 1998
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF ACCOMACK COUNTY
                       Glen A. Tyler, Judge

          Jon C. Poulson for appellant.

          John K. Byrum, Jr., Assistant Attorney
          General (Richard Cullen, Attorney General, on
          brief), for appellee.


     Barry Thomas Johnson (appellant) was convicted in a bench

trial in the Accomack County Circuit Court for "failure to tag

striped bass after bringing to shore" in violation of Code

§ 28.2-201 and Virginia Regulation 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.[1]  On appeal, he

contends the trial court erroneously denied his motion to

suppress evidence seized during a warrantless search of his

business premises.  The Commonwealth contends the administrative

search exception to the warrant requirement validated the search

or, alternatively, that appellant had no reasonable expectation

of privacy in the area searched.  We conclude that the

Commonwealth waived its right to assert the administrative search

exception as a basis for the search when it conceded in the trial

_____

          [1]This regulation, originally codified at 4 VAC 20-251-10,
has been renumbered, and an amended version may be found at 4 VAC
20-252-10.

court that the exception did not apply, and we hold that the search violated the Fourth Amendment. For the reasons set forth more fully below, we reverse appellant's conviction.

## Background

At about 10:30 a.m. on January 30, 1996, Officer Judith Mackley of the Virginia Marine Resources Commission (VMRC) entered onto the Onancock fish house property, co-leased by appellant, in order to "conduct an inspection of seafood." She did not have a search warrant.

The fish house property is comprised of (1) a warehouse building, approximately "180 foot square," with a small office in the southwest corner and (2) a dock adjacent to the Onancock Creek on the west. The property is bounded on the north and west by the Onancock Creek. A right-of-way leading due south from the southeast corner of the warehouse property connects it to King Street, a public thoroughfare. The property to the south of the warehouse and west of the right-of-way is the Walker Gravel Company.

On January 30, 1996, the entrance to the gravel company property bore three signs: a "POSTED private property" sign on the building to the left of the entrance; a "PRIVATE PROPERTY NO TRESPASSING" sign hanging from a chain across an opening in the fence which served as the entrance; and a "NO TRESPASSING" sign on the fence to the right of the entrance. However, the chain was down in order to permit entry during Walker's business hours.

Appellant and his co-lessees had permission to use the Walker property.

Mackley parked on the gravel company lot on the south side and walked onto the fish house property through an opening in the fence and toward "NO TRESPASSING" and "DANGER KEEP OUT" signs posted on the south side of the warehouse. Mackley understood that the signs meant "[y]ou cannot go onto that property or ground," but she nevertheless proceeded past the signs and the entrance to the office and walked down the dock on the west side of the building. The weather was cold and drizzly, and all doors on the south side of the building were closed.

After walking approximately seventy feet down the dock, Mackley saw about thirty untagged striped bass below the gunnel on the deck of appellant's boat, the Lady Bea, which was moored to the dock. Mackley walked further, looked through an open ten-by-ten-foot door on the right, and saw appellant's mate weigh an untagged striped bass and drop it into an iced seafood box. A conveyor belt moved the fish from the boat through the open door into the warehouse's packing area. The fish could not have been "offloaded . . . without the door being open."

Appellant, who was in the office, saw Mackley walk past the office window toward the dock packing area, and he proceeded to the packing area, as well. When he rounded the corner, Mackley pointed to the fish in the open box, and appellant confirmed that they were his. He also confirmed that the fish on his boat were

his.  Appellant "immediately" asked, "When are you supposed to tag them?"  Mackley replied, "[Y]ou're supposed to tag them as soon as you capture them and certainly by the time you get to shore."  Appellant responded, "Nobody tells me nothing.  I didn't know that you were supposed to tag them."  Mackley then walked through the open warehouse door, put her hands on eleven closed seafood boxes sitting on a pallet and asked appellant if they were his.  When he responded affirmatively, she removed the lids and discovered additional untagged striped bass.  She seized all the untagged fish.  Mackley agreed that she had seen nothing illegal on appellant's boat or inside the warehouse until she had entered the property and walked down the dock.

The evidence showed that appellant and five other men, including James Stalgaitis and Sam Swift, leased the warehouse and property jointly and had done so for about ten years.  The men were all watermen, working separately, who used the property to store equipment, dock their boats and pack fish for wholesale, not retail, sale.  They all used the whole premises, which included a cooler and an ice machine, and did not have separate storage areas.  The property had been posted for the duration of their lease.  It was not open to the general public, and entry was by invitation only.  Each co-lessee had a key to the premises and the right to exclude others subject to the majority rule.  The building was poorly lit, and two of the lessees testified that when the door facing King Street or the door facing Onancock

- 4 -

Creek was open, "It's a dark place." "All you will see [from the street or the creek] . . . is a black hole. You can't see through the building" and "would [not] really know what was there."

Appellant offered evidence that the last waterman to return each evening was responsible for securing the warehouse premises. The Commonwealth presented evidence that the local police had found the darkened warehouse open and apparently untended on fifteen to twenty occasions during the year prior to trial. On cross-examination, the police officer admitted that he did not actually search the premises and did not know whether any of the watermen were still on the way to shore in their boats.

In the year prior to January 30, 1996, Mackley had been on the fish house property nine times to conduct seafood inspections and to check the condemned area of the adjacent Onancock Creek. On none of those occasions did she announce that she was coming or ask for permission to be on the property. On one occasion during August of 1995, Stalgaitis found Mackley on appellant's boat, which was moored at the warehouse dock, when appellant was not on the premises. She was "looking in the fish box." Stalgaitis told her, "[T]his is private property. . . . The boat is private and you really don't have the authority to do this." Mackley responded that she had the authority and that appellant had given her permission.

Mackley testified that she did not remember the conversation

- 5 -

very well, but confirmed that a conversation took place while she was on appellant's boat and that she told Stalgaitis she had "the right to make an inspection."  She indicated that she had boarded the boat "when [appellant] was there" and that she might have asked for his consent.  She did not believe that Stalgaitis told her the dock and the boat were private property, but said that "[h]e might have."  She conceded that other than the August 1995 incident when appellant may have given her permission to search, neither appellant nor any of his co-lessees had given her permission to come onto the property.

In addition to Mackley, other VMRC officials visited the warehouse property for various purposes, including posting notices and conducting inspections.  Other than Stalgaitis' August 1995 encounter with Mackley, the watermen did not challenge the authority of the VMRC officers to be on the premises, but none gave them blanket permission to be on the premises.  Some of the officers routinely came to the office first to ask permission to visit the rest of the property, and some did not.  All wore uniforms, badges, and guns.  Appellant and his co-lessees did not know the nature or scope of VMRC authority to come onto their property.  Officer Landon admitted that a person refusing or interfering with an inspection could be charged for that offense.

Appellant admitted that as of January 30, 1996, he was not certain whether their lease covered the dock area.  He admitted

that it was not unusual for people other than wholesalers to come to the property, but indicated that he would ask what they wanted.

At the request of the trial court, appellant and the Commonwealth's attorney reviewed case law relating to the administrative search exception to the warrant requirement, and both represented to the trial court that the exception did not apply in this case. Based on the parties' representations and its own review of the relevant legal principles, the trial court held that the VMRC had no administrative authority to conduct a warrantless inspection or search of the premises for untagged striped bass. However, it held that appellant had no subjective expectation of privacy in the dock and warehouse because he and his co-lessees allowed other people, including VMRC officials, on the property for a variety of reasons and that the untagged fish were in plain view of both those on the property and those on the navigable waters of Onancock Creek. It noted that when appellant left the fish in plain view of his co-lessees, he showed that he had no legitimate expectation of privacy in them.

The trial court appeared to conclude that the viewing of the warehouse was a "search," but held that it was reasonable under the circumstances: "Once the officer observed the [untagged fish in the boat], she then could legitimately look to her right, through the open door and see the fish on the scale," and exigent circumstances permitted her to investigate because the fish were

being boxed for imminent removal.  Ultimately, it held that the fish in the boat would be sufficient for the Commonwealth to prevail in its prosecution. . . .  Were it not for the fact that defendant's boat lay, though moored ashore, in public waters laden with untagged striped bass for all to see, including the other tenant present at the time, this case may have been different.

<u>Reasonableness of the Search Under the Fourth Amendment</u>

In reviewing a trial court's denial of a motion to suppress, "[t]he burden is upon [appellant] to show that this ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error." <u>Fore v. Commonwealth</u>, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980). "Ultimate questions of reasonable suspicion and probable cause to make a warrantless search" involve issues of both law and fact and are reviewed <u>de novo</u> on appeal. <u>See</u> <u>Ornelas v. United States</u>, 116 S. Ct. 1657, 1659 (1996). "In performing such analysis, we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." <u>McGee v. Commonwealth</u>, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (<u>en</u> <u>banc</u>) (citing <u>Ornelas</u>, 116 S. Ct. at 1663).

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. These protections apply to people, not places, <u>see</u> <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967), and may, therefore, extend to commercial premises as well as private residences. <u>See</u> <u>Dow Chem. Co. v. United States</u>, 476 U.S. 227, 235 (1986). "The businessman, like the occupant of a residence, has a

constitutional right to go about his business free from unreasonable official entries upon his private commercial property."  See v. City of Seattle, 387 U.S. 541, 543 (1967). Therefore, the Fourth Amendment prohibits warrantless intrusions into non-public areas of a business unless a recognized exception to the warrant requirement is established.  See Marshall v. Barlow's, Inc., 436 U.S. 307, 312-13 (1978).

The United States Supreme Court has recognized an exception to the warrant requirement "where commercial premises of 'closely regulated industries' are searched."  Commonwealth v. Burgan, 19 Va. App. 172, 175, 450 S.E.2d 177, 178 (1994) (citing New York v. Burger, 482 U.S. 691, 699-700 (1987)).  An administrative search may be conducted without a warrant if the search satisfies three criteria:

> First, "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made."  Second, "the warrantless inspections must be 'necessary to further [the] regulatory scheme.'"  Third, the inspection program must "provide a constitutionally adequate substitute for a warrant" by informing the owner that inspections will occur regularly, and notifying him or her of the permissible scope and who may conduct the inspections, as well as requiring that the permitted inspection is "carefully limited in time, place, and scope."

Id. at 175, 450 S.E.2d at 178-79 (citations omitted) (quoting Burger, 482 U.S. at 702-03).

In this case, the Commonwealth's attorney conceded in the

- 10 -

trial court that "there is no regulatory scheme under Burger" that would permit application of the administrative search exception to the warrant requirement. The trial court agreed. Therefore, the Commonwealth is barred from asserting the exception as a basis for affirmance on appeal. See, e.g., Manns v. Commonwealth, 13 Va. App. 677, 679-80, 414 S.E.2d 613, 615 (1992) (holding that a party, "having agreed upon the action taken by the trial court, should not be allowed to assume an inconsistent position") (quoting Clark v. Commonwealth, 220 Va. 201, 214, 257 S.E.2d 784, 792 (1979)).

In the absence of application of the administrative search exception to the warrant requirement, we must apply general principles regarding searches of commercial premises. As a general rule, "there is a lesser expectation of privacy in commercial as contrasted with residential buildings." United States v. Bute, 43 F.3d 531, 536 (10th Cir. 1994). However, "classifying a building as 'commercial' is not dispositive as to the level of privacy that attaches to such premises." Id. A court must determine whether the individual maintains a legitimate expectation of privacy in the object or premises to be searched, which involves a two-part inquiry. See Wellford v. Commonwealth, 227 Va. 297, 301, 315 S.E.2d 235, 237 (1984). First, we must determine whether the individual has manifested "a subjective expectation of privacy" in the object of the challenged search. Id. This inquiry is a factual determination

to which we must give deference on appeal.  See United States v. McBean, 861 F.2d 1570, 1573 (11th Cir. 1988).  Second, we must determine whether the expectation of privacy is objectively reasonable, one that society is willing to recognize as legitimate.  See Wellford, 227 Va. at 301, 315 S.E.2d at 237. This is a legal determination, requiring no deference on review.  See McBean, 861 F.2d at 1573 n.7.

The United States Supreme Court long has held that "[t]he curtilage area immediately surrounding a private house" is "a place where the occupants have a reasonable and legitimate expectation of privacy that society is prepared to accept."  Dow Chem., 476 U.S. at 235 (citing California v. Ciraolo, 476 U.S. 207 (1986)).  In contrast, "the Court has drawn a line as to what expectations are reasonable in the open areas beyond the curtilage of a dwelling:  'open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from governmental interference or surveillance.'"  Id. (quoting Oliver v. United States, 466 U.S. 170, 179 (1984)).  An area "need be neither 'open' nor a 'field' as those terms are used in common speech."  Id. at 236 (quoting Oliver, 466 U.S. at 180 n.11).

The United States Supreme Court applied the open fields doctrine in Dow Chemical to permit aerial surveillance of the open areas of a large industrial plant because those areas were "open to the view and observation of persons in aircraft lawfully

- 12 -

in the public airspace immediately above or sufficiently near the area for the reach of cameras." Id. at 239.  It expressly noted, however, that the intrusion in this case occurred "without physical entry." Id. at 237.  It emphasized that "Dow's inner manufacturing areas [were] elaborately secured to ensure that they [were] not open or exposed to the public from the ground" and that "[a]ny actual physical entry . . . into any enclosed area would raise significantly different questions." Id. at 236-37; see also id. at 239 n.7.  In so doing, the Court clearly indicated that the vantage point of the official is a critical component of the analysis; what is an "open field" from the air may be a protected business curtilage if observed from inside the curtilage on the ground.  "[T]he legality of the search is contingent on the police having a right [under the Fourth Amendment] to be where they were when they discovered the item." United States v. Swart, 679 F.2d 698, 701 (7th Cir. 1982).

In evaluating whether an area is more like an open field or a protected curtilage, courts examine a variety of factors to determine whether an expectation of privacy in the place is subjectively and objectively reasonable.[2]  One factor is whether the accused "could reasonably assert control or supervision over, or exclude others from access to, the place." United States v. Nuesca, 945 F.2d 254, 259 (9th Cir. 1991); see Oliver, 466 U.S.

[2]The United States Supreme Court has not expressly addressed the existence of commercial, as opposed to residential, curtilage.  See Dow Chem., 476 U.S. at 239 n.7.

- 13 -

at 183 ("[T]hat [an] intrusion is a trespass at common law" is not dispositive, for "[t]he existence of a property right is but one element in determining whether expectations of privacy are legitimate."); see also McCoy v. Commonwealth, 2 Va. App. 309, 311-12, 343 S.E.2d 383, 385 (1986). A proprietor who "has made a general public invitation to enter the premises" has "a lesser expectation of privacy than in a commercial building that is not open to the public, such as a warehouse." Bute, 43 F.3d at 537 (emphasis added). Evidence that some or all of a commercial building or premises is closed to the public includes the posting of signs and erection of barricades. See United States v. Hall, 47 F.3d 1091, 1096 (11th Cir. 1995). Other factors include the proximity of the claimed curtilage to the protected premises, whether the claimed curtilage is inside an enclosure surrounding the protected premises, and the nature of the uses to which the claimed curtilage is put. See United States v. Dunn, 480 U.S. 294, 301 (1987).

In this case, the uncontroverted evidence showed that Mackley discovered the untagged striped bass while standing where she did not have a lawful right to be and where appellant had an objectively and subjectively reasonable expectation of privacy. The evidence showed that the warehouse and adjacent dock were private property not open to the public and were posted with "No Trespassing" signs. Offloading the catch across the dock and through the open warehouse door on a conveyor belt was an

integral part of appellant's business.

In addition, those purchasing seafood from appellant and his co-lessees did so on a wholesale, not retail, basis and visited the premises by invitation only. As found by the trial court, people other than wholesalers or law enforcement officers came to the property by permission only, and appellant testified that he would ask each such visitor his purpose in visiting. In addition, the record contains no indication that these wholesale purchasers or other guests ever visited the dock area. "[G]overnment agents cannot attempt to justify a warrantless search on the claim of a reduced expectation of privacy on business premises when the agents do not see the items as a customer would ordinarily see them." Swart, 679 F.2d at 701 (citing Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329 (1979)). Finally, that appellant's co-lessees also had access to the premises did not lessen appellant's expectation of privacy from "guests" whose presence was neither invited nor consented to by appellant or his co-lessees. See Commonwealth v. Ealy, 12 Va. App. 744, 750-51, 407 S.E.2d 681, 685-86 (1991) (holding that accused had legitimate expectation of privacy in detached garage owned by his mother where "he had permission to be there, he possessed the combination to the lock on the door, he stored personal items in the garage, and he took steps to keep the public out of the garage when he or his [two] brothers were not present").

On the day at issue, appellant was using the dock immediately adjacent to the warehouse to offload fish from his boat onto a conveyor belt transporting the fish into the warehouse. Although the dock itself was adjacent to the navigable waters of the Onancock Creek, Mackley did not view the untagged fish from the creek. Rather, she walked onto the fish house property past a "NO TRESPASSING" sign and an occupied business office and proceeded seventy feet down the dock on the left side of the warehouse before seeing the fish. That others may have been able to see the untagged fish in the boat or inside the warehouse from the navigable waters of the Onancock Creek is irrelevant to our analysis, for the record contains no affirmative evidence that the fish actually were visible from that location[3] or, more importantly, that Mackley actually viewed them from the creek.

Therefore, Mackley's presence on the premises violated appellant's Fourth Amendment rights unless Mackley had consent to be there. "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily

---

[3]Although the record indicates that some portion of the creek adjacent to the dock was navigable, it also clearly indicates that a portion had been condemned. Furthermore, the record contains no evidence regarding the volume of traffic on the navigable portion of the creek or whether VMRC officers ever traveled on the creek. In fact, Mackley testified that she came onto the fish house property, rather than the navigable portion of the creek, to check the condemned portion.

given . . . ." Florida v. Royer, 460 U.S. 491, 497 (1982)
(plurality op.); see Lowe v. Commonwealth, 218 Va. 670, 678, 239
S.E.2d 112, 117 (1977). That "burden . . . is not satisfied by
showing a mere submission to a claim of lawful authority."
Royer, 460 U.S. at 497. Where consent is based on implication,
the Commonwealth bears a heavy burden of proof. See Walls v.
Commonwealth, 2 Va. App. 639, 645, 347 S.E.2d 175, 178 (1986).
But see Grinton v. Commonwealth, 14 Va. App. 846, 851, 419 S.E.2d
860, 863 (1992) (holding that once initial consent to search has
been given, scope of search may be broadened "by passive
acquiescence"). Whether the consent was voluntary is a question
of fact to be determined in view of the totality of the
circumstances. See Ohio v. Robinette, 117 S. Ct. 417, 421
(1996). Probative factors include "knowledge of the right to
refuse consent," Schneckloth v. Bustamonte, 412 U.S. 218, 227
(1973), the level of business sophistication, see United States
v. O'Looney, 544 F.2d 385, 388 (9th Cir. 1976), and the display
of authority or show of force by the officer or officers
involved. See Reynolds v. Commonwealth, 9 Va. App. 430, 439-40,
388 S.E.2d 659, 665 (1990).

"A consensual search is reasonable if the search is within
the scope of the consent given." Grinton, 14 Va. App. at 850,
419 S.E.2d at 862; see Lugar v. Commonwealth, 214 Va. 609,
611-12, 202 S.E.2d 894, 897 (1974) (holding that consent to
search apartment for fugitive limited officers to "search of

places . . . where a fugitive might hide").  That Mackley may have had permission to be on the premises and to search appellant's boat on a prior occasion, in August 1995, could not reasonably be viewed as giving her the authority to be on the premises on January 30, 1996.  It was uncontested (1) that none of the co-lessees had given Mackley or any other VMRC officer blanket permission to come onto the property or to search the premises, (2) that, on January 30, 1996, Mackley neither announced her entry onto the property nor sought permission to enter, and (3) that she had already traveled past the occupied office and seventy feet down the dock, to the place from which she saw the untagged bass in the boat and in the warehouse, before appellant was able to catch up with her.  Mackley, dressed in uniform and carrying a firearm, behaved as if she had a legal right to be on the property and never informed appellant or his co-lessees that they had the right to deny her access to the premises.  The totality of the circumstances indicates that Mackley lacked express consent for entry on the date at issue. Contrary to the ruling of the trial court, we are unwilling to hold that appellant forfeited his Fourth Amendment rights merely because he failed to assert them against the VMRC officials on prior occasions.

Because Officer Mackley lacked authority under the Fourth Amendment to be on appellant's property on the day in question, all evidence seized as a result of her presence should have been

excluded, and the trial court erred in denying the motion to suppress. Accordingly, we reverse appellant's conviction and remand for further proceedings if the Commonwealth be so advised.

<u>Reversed and remanded.</u>