COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Benton, Coleman,
     Willis, Elder, Bray, Bumgardner and Senior Judge Baker[*]
Argued at Richmond, Virginia


WELFORD V. WASHINGTON
                                        OPINION BY
v.   Record No. 0230-96-2     JUDGE RUDOLPH BUMGARDNER, III
                                       JANUARY 19, 1999
COMMONWEALTH OF VIRGINIA


                  UPON A REHEARING EN BANC

         FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                   Robert W. Duling, Judge

         Patricia P. Nagel, Assistant Public Defender
         (David J. Johnson, Public Defender, on
         brief), for appellant.

         Kathleen B. Martin, Assistant Attorney
         General (Mark L. Earley, Attorney General, on
         brief), for appellee.



     Welford V. Washington appeals his convictions of possession

of heroin and of cocaine.  He contends that the trial court erred

in denying his motion to suppress evidence found when the police

seized him and entered his home.  A panel of this Court reversed

the convictions.  See Washington v. Commonwealth, 26 Va. App.

657, 496 S.E.2d 135 (1998).  Upon a rehearing en banc, we affirm

his convictions.

     Reginald Ford was free on bond, but a felony capias had been

issued for his arrest.  His bondsman received a tip from an

_____

     [*]Judge Baker participated in the hearing and decision of
this case prior to the effective date of his retirement on July
31, 1998 and thereafter by his designation as senior judge
pursuant to Code § 17.1-400, recodifying Code § 17-116.01.

informant that Ford was at 2347 Bethel Street in Richmond, and the bondsman contacted Officer Michael Moore for assistance. Before going to that address, Officer Moore verified that a capias was outstanding, but he did not obtain a copy of the capias. He believed that Ford either had jumped or was about ready to jump bail. Officer Moore did not determine Ford's residence address and did not have a description of him. The bondsman knew and could recognize Ford.

Two additional officers met Moore and the bondsman at 2347 Bethel Street. The additional officers learned that Ford was supposed to be in the house. They only knew his name and did not have a description. Officer Moore and the bondsman went to the front door, and the other two went to the back door. Moore knocked on the front door, and Officer Samuels, one of the officers at the back door, heard the knocking.

Three to four seconds after the knocking began, the defendant opened the back door "rather fast" and stepped out. Officer Samuels placed his hands on the defendant and asked, "Mr. Ford?" The defendant replied, "[N]o. I'm Welford Washington." Samuels frisked him and then asked for identification. The defendant said that his driver's license was inside and turned to go back inside. Samuels stepped in front of him and entered the house first as the second officer followed. As soon as they entered the kitchen, the officers saw cocaine and heroin on the kitchen table. They seized the drugs and arrested Washington.

Ford was not in the residence.

The defendant contends the officers violated the Fourth Amendment when they entered his residence without a search warrant.  We hold that the officers could go upon the property in search of Ford, that they had reasonable belief the person exiting the house was Ford, and that they could accompany that person back into the house while they completed identifying him. The officers did not violate the defendant's rights.

The police possessed a capias for Reginald Ford's arrest. The capias was issued on probable cause, and it required all police officers to arrest Ford if they found him.  The bondsman had pledged to produce Ford according to the terms of the bond. The police officers possessed judicially mandated authority to seize Ford while the bondsman had statutory authority to seize and return him to the court.  In exercising their authority, either could lawfully approach any citizen and ask if he were Ford or if he had information that would help them find Ford.

The officers did not implicate the Fourth Amendment when they went to 2347 Bethel Street to find Ford.  Not every encounter that the police have with a member of the public is a seizure.  "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions . . . ."  Florida v. Royer, 460 U.S. 491, 497 (1983) (citation omitted).  "[O]ur recent decision in Royer . . .

plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." I.N.S. v. Delgado, 466 U.S. 210, 216 (1984).

Police officers implicate the Fourth Amendment when they seize a person or search a person's home or effects. A seizure occurs when by physical force or show of authority and submission thereto, an individual's freedom of movement is restrained and the person is not free to leave. See California v. Hodari D., 499 U.S. 621, 626 (1991).

The critical moment occurred when the defendant stepped out the back door and the police confronted him. The officer seized Washington when he placed his hands on the defendant. At that instant, if the officers had reason to believe that the person was Ford, they had the right to detain that person briefly and to identify him. See Terry v. Ohio, 392 U.S. 1, 21-22 (1968). Cf. White v. Commonwealth, 25 Va. App. 662, 666-67, 492 S.E.2d 451, 453 (1997) (en banc). The issue is whether Officer Samuels had a reasonable suspicion that Reginald Ford was coming out the back door.

We need not address whether the officers believed that criminal activity was occurring. The police were not investigating a crime. The judge who issued the capias determined that the person named in the warrant was engaging in criminal conduct. The officers were executing lawful process, an

arrest warrant.  Their investigation was to find Ford.  When they gathered enough information to develop a reasonable, good-faith belief that they had found Ford, they could seize that person.  Since the warrant gave the officers probable cause to arrest, the only issue is whether the officers had a reasonable and good-faith belief that the defendant was Ford.  See Shears v. Commonwealth, 23 Va. App. 394, 399, 477 S.E.2d 309, 311 (1996) (citing United States v. McEachern, 675 F.2d 618, 621 (4th Cir. 1982)).

The informant's tip was unsubstantiated information about Ford's location.  "An informant's tip can provide the justification for a Terry stop even if the informant's reliability is unknown and certainly can do so if, as here, the information is corroborated."  United States v. Porter, 738 F.2d 622, 625 (4th Cir.), cert. denied, 469 U.S. 983 (1984).  In this case, the officers raised their level of knowledge to reasonable suspicion by corroborating the tip.

To give the tip some indicia of reliability, the officers needed only to verify that the person detained was reasonably believed to be the person whom they were to arrest pursuant to the capias.  Anonymous information sufficiently corroborated may give reasonable suspicion for an investigative stop although the unverified tip by itself would not justify a forcible stop.  See Alabama v. White, 496 U.S. 325, 331 (1990).

Partial corroboration has always been available to bolster

the reliability of a tip and increase the accumulated knowledge to the level of reasonable suspicion. If partial corroboration can raise an unreliable tip to the point that it provides probable cause, see Draper v. United States, 358 U.S. 307, 313 (1959); Illinois v. Gates, 462 U.S. 213, 246 (1983); Alabama v. White, 496 U.S. at 331, it can raise such a tip to the point it provides reasonable suspicion.

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. at 330.

Corroboration of the informant's tip could have been accomplished many ways. In this case, Moore verified that there was a capias for Ford, and he took the bondsman who could identify Ford on sight with him. They went to the house to see if Ford was there. The fugitive warrant gave the officer reason to suspect that the person might flee. As soon as they knocked on the front door, someone exited the back door rather fast. A reasonable person could believe that these were the acts of a person trying to flee the police. The police were looking for just such a person at this address. The defendant's reaction to the police knocking at the door provided articulable facts that corroborated the tip and raised Officer Samuels' accumulated

knowledge to the level of reasonable suspicion.

A single instance of attempted flight or furtive behavior by a suspect is suggestive of guilt and provides a significant reason to believe that the informant was correct and that Reginald Ford was at the specified address.  See Gregory v. Commonwealth, 22 Va. App. 100, 109, 468 S.E.2d 117, 121 (1996) ("defendant's . . . behavior tended to support informer's report").  "[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest."  Sibron v. New York, 392 U.S. 40, 66-67 (1968).

If articulable facts support a reasonable suspicion that a person has committed a criminal offense, the police may stop that person to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information.  See Hayes v. Florida, 470 U.S. 811, 816 (1985).  "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."  Adams v. Williams, 407 U.S. 143, 146 (1972) (citations omitted).

Officer Samuels had reasonable suspicion that Ford was the person coming out the back door.  He had the authority to detain

briefly the person whom he suspected was Ford and to confirm his identity. Although Washington gave his name, the officer was entitled to verify this statement. See Terry, 392 U.S. at 21-22; Jones v. Commonwealth, 230 Va. 14, 19, 334 S.E.2d 536, 540 (1985) (questions about identity did not end when officer was handed identification card that appeared to have been tampered with).

The next question is whether Samuels could accompany Washington inside the dwelling without a search warrant. "[W]arrantless entries into dwellings, followed by . . . arrests therein, . . ., are presumed to be unreasonable, in Fourth Amendment terms, casting upon the police a heavy burden of proving justification by exigent circumstances." Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 752-53 (1985) (citations omitted), cert. denied, 479 U.S. 813 (1986). See Payton v. New York, 445 U.S. 573, 589-90 (1980).

One of the situations that has been held sufficient to justify a warrantless intrusion upon a citizen's personal privacy is that "[o]nce an officer has lawfully stopped a suspect, he is 'authorized to take such steps as [are] reasonably necessary to protect [his and others'] personal safety and to maintain the status quo during the course of the stop.'" Servis v. Commonwealth, 6 Va. App. 507, 519, 371 S.E.2d 156, 162 (1988) (alteration in original) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). As we noted in Servis, relying upon Michigan v. Long, 463 U.S. 1032 (1983), frisking for weapons

- 8 -

based upon the exigency of protecting an officer's safety is not limited to a pat-down of the suspect but may extend to nearby vehicles, as in Long, or rooms or premises to which the suspect may retreat to secure a weapon, as in Servis. See 6 Va. App. at 520, 371 S.E.2d at 162-63.

Once the officer had reason to stop and identify the defendant, he could stay with the defendant to keep him in sight. See id. at 519, 371 S.E.2d at 162. This protects the police, an important consideration during any investigatory detention. It also maintains the status quo.

Officer Samuels knew that Ford was a fugitive wanted for a crime. He detained the person he reasonably suspected was trying to evade the officers at the front door. The officer could not reasonably be expected to allow that person to re-enter the premises alone. Although Samuels could not have entered the premises to search for weapons or contraband, he could accompany the suspect inside solely to maintain the status quo and ensure the officers' safety. See id.

Samuels reasonably suspected that Washington was Ford, a person for whom he possessed a capias as a fugitive. Thus, not only could Samuels enter the premises to maintain a safe situation while identifying the person, Samuels could enter the premises to prevent the suspected fugitive from escaping. Cf. United States v. Santana, 427 U.S. 38, 42 (1976) (officer had right based on exigencies of situation to pursue individual into

private premises without a search warrant where officer had set in motion an arrest outside).  The subject of an arrest warrant can be seized before entering or after leaving the home of a third party.  See Steagald v. United States, 451 U.S. 204, 221 (1981).  The threshold of one's home may be private under the common law of property, but it is a "public place" when interpreting the Fourth Amendment.  See Santana, 427 U.S. at 42.

That Samuels could have taken the defendant around to the front door or had the bondsman come to the back door to identify defendant does not detract from the propriety of what he did. "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques."  United States v. Sokolow, 490 U.S. 1, 11 (1989). "[D]efining what means are 'least intrusive' is a virtually unmanageable and unbounded task."  United States v. Sharpe, 470 U.S. 675, 694 (1985) (Marshall, J., concurring).  When "evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."  Id. at 685.  The test is whether the police methods were calculated to confirm or dispel the suspicion quickly and with minimal intrusion upon the person detained.  See Thomas v. Commonwealth, 16 Va. App. 851, 856-57, 434 S.E.2d 319, 323 (1993).

Officer Samuels possessed reasonable suspicion to detain the person he reasonably thought was Ford while verifying his

identity.  Samuels had the right to accompany Washington into the home to prevent him from fleeing and to ensure the officers' safety.  The contraband was not the fruit of an illegal entry or illegal search because the officers immediately observed it in the kitchen in open view.  We affirm the trial court's decision.

<u>Affirmed</u>.

Benton, J., dissenting.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. Contrary to the majority's ruling, I believe the officers' entry into Welford Washington's residence violated Washington's Fourth Amendment rights.  For this reason, I would reverse the trial judge's refusal to suppress the seized evidence.

I.

A bondsman informed Officer Michael Moore that he had received a tip from an informant that Reginald Ford, for whom a capias had been issued, could be found at 2347 Bethel Street. Although Officer Moore verified that a capias was outstanding, he did not obtain a copy of the capias.  Additionally, Moore never independently confirmed Ford's address and did not obtain a physical description of him.  Only the bondsman could identify Ford.  Based upon the limited information he had received, Moore believed Ford "had either jumped or was about ready to jump [bail]."

At 10:30 a.m., Officer Samuels and Sergeant Kemp met Moore and the bondsman at 2347 Bethel Street, which was Welford Washington's residence.  Samuels testified that he was told that Ford "was supposed" to be in the residence.  He knew only Ford's name, and he did not have a physical description of Ford. Samuels knew only that a capias had been issued, "that it was a

bondsman's bail piece [and that] the bondsman was there to pick [Ford] up." Although he did not know whether Ford had originally been charged with a felony or a misdemeanor and he had not been told that Ford was dangerous, Samuels testified that he "take[s] everybody to be dangerous."

Samuels and Kemp went to the back door of Washington's residence. With the bondsman accompanying him, Moore went to the front door and knocked on the door. Moore did not see anyone look out of a window and did not hear any activity in the residence.

Samuels testified that he heard Moore knock on the front door. Three to four seconds after Moore knocked, Washington opened the back door and stepped out. Samuels testified that Washington opened the door "rather fast." Samuels placed his hands on Washington and said, "Mr. Ford." Washington replied, "[N]o. I'm Welford Washington." Samuels then frisked Washington and asked Washington for identification. Washington said his driver's license was inside the residence and turned to go inside. Samuels went into the house in front of Washington. Sergeant Kemp followed. When Samuels entered the kitchen, he saw "syringes with cocaine and heroin" residue and baggies of white powder. He arrested Washington. Ford was not in the residence.

The trial judge ruled that Samuels' detention of Washington and "limited intrusion" into Washington's residence were lawful.

II.

- 13 -

On appeal, we review de novo the trial judge's determination that reasonable suspicion existed to detain Washington. See Johnson v. Commonwealth, 26 Va. App. 674, 682, 496 S.E.2d 143, 147 (1998). To justify a Terry detention, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). When a detention is based on an informant's tip, "[t]he informant must provide some basis for his knowledge [of the facts he reported] before the police officer relies upon it as being reliable enough to support an investigatory stop." Beckner v. Commonwealth, 15 Va. App. 533, 537, 425 S.E.2d 530, 533 (1993). In addition, "[s]ignificant aspects of the informer's information must be independently corroborated . . . to give 'some degree of reliability to the . . . allegation' of the informant." Bulatko v. Commonwealth, 16 Va. App. 135, 137, 428 S.E.2d 306, 307 (1993) (quoting Alabama v. White, 496 U.S. 325, 332 (1990)).

Clearly, the officers lacked a reasonable suspicion that Ford was at 2347 Bethel Street, that Washington was Ford, or that Washington was engaging in criminal activity. The evidence proved that Washington resided at 2347 Bethel Street. No evidence established the basis of the unknown informant's asserted knowledge that Ford could be found at Washington's residence. The bondsman could not create legal justification to stop Washington merely by communicating to the police the

- 14 -

bondsman's informant's unsubstantiated tip that Ford might be in the residence.  See United States v. Hensley, 469 U.S. 221, 232 (1985) (ruling that if a communication "has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment"); United States v. Robinson, 536 F.2d 1298, 1300 (9th Cir. 1976) (holding that if a police officer does not have a reasonable basis to conduct an investigative stop "he could not create justification simply by relaying a direction to a fellow officer to make the stop").

Furthermore, no evidence established that either the informant or the bondsman was a reliable informant.  The United States Supreme Court has held that the police may rely on information from an anonymous tipster to briefly detain a suspect only if the information from the anonymous tipster is "sufficiently corroborated" to provide an indicia of reliability. White, 496 U.S. at 331.  In White, which the Supreme Court itself described as "a close case," id. at 332, the Court found indicia of reliability because of the following:

> [T]he independent corroboration by the police of significant aspects of the informer's predictions imparted some degree of reliability to the other allegations made by the caller.
>
> [It is] also important that, as in [Illinois v. Gates, 462 U.S. 213 (1983)], "the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." Id., at 245.

- 15 -

<u>Id.</u> at 332.

Clearly, the lesson to be gleaned from <u>White</u>, <u>Gates</u>, and <u>Draper v. United States</u>, 358 U.S. 307 (1959), is that a tip from an anonymous source does not gain indicia of reliability merely because the police decide to act upon the tip. The Supreme Court has never lowered the bar to the level that the majority now deems acceptable. In this case, the officers corroborated no information supplied by the bondsman's unknown, anonymous informant. The record contains no evidence, apart from the unsubstantiated and uncorroborated informant's tip, that Ford might have been in or near the residence. The officers acted upon the tip and by so acting set in motion circumstances that they deemed suspicious. When the officers knocked on the door, a man emerged from the residence. The emergence of an unknown male from the residence does not, to my mind, constitute corroboration, especially when the officers possessed no ability to recognize Ford and the man who emerged immediately identified himself.

None of the officers attempted to determine Ford's address or determine who resided at 2347 Bethel Street.[1] Because neither

_____

[1] In fact, the failure of the officers to take reasonable steps to corroborate the information supplied by the bondsman demonstrates the fallacy of the majority's position. Had the officers first determined who resided at 2347 Bethel Street, obtained a description of Ford, determined the purpose for which the capias had been issued – all perfectly reasonable steps to take – the incident may never have occurred. Rather than condemn the officers' failure to investigate before acting, the majority rewards their conduct and, by so doing, denigrates the protections afforded by the Fourth Amendment.

the informant's reliability nor the basis for the informant's knowledge was established, the officers lacked a reasonable suspicion to believe that Ford was in the residence at 2347 Bethel Street. See McGhee v. Commonwealth, 25 Va. App. 193, 203, 487 S.E.2d 259, 264 (1997) (en banc). See also State v. Rubert, 612 P.2d 771 (Or. App. 1980).

The uncontroverted testimony established that none of the officers had a physical description of Ford. Lacking a physical description of Ford, Samuels lacked a reasonable suspicion to believe that Washington was Ford. He simply speculated that Washington might be Ford. The uncorroborated, unsubstantiated informant's tip was not enough, alone, to provide Samuels with reasonable suspicion to believe that Ford was in the residence or that any man in the residence might be Ford. Furthermore, Washington promptly identified himself to Samuels by stating that his name was Welford Washington.

The fact that Washington opened the rear door of the residence after Moore knocked on the front door is insufficient to justify a detention of Washington. No evidence proved that Moore announced his presence or that Washington knew a police officer was at the front door. No evidence proved where Washington was located in his house when Moore knocked. Washington testified that he opened the rear door because he believed the knock was at that door. Indeed, the reasonableness of his response in opening the rear door is buttressed by the

fact that two police officers were at that door.

Washington's appearance at the rear door could give rise "to no more than an 'inchoate and unparticularized suspicion or "hunch"'" concerning his intentions. Deer v. Commonwealth, 17 Va. App. 730, 736, 441 S.E.2d 33, 37 (1994) (quoting Terry, 392 U.S. at 27). The officer's knock at a door caused Washington to respond. Washington opened a door; he did not leave through a window. Any conclusion that he opened the door to escape is pure speculation. Furthermore, even if Samuels suspected that Washington intended to flee, "flight alone may not supply sufficient reason to suspect a person of criminal activity." Buck v. Commonwealth, 20 Va. App. 298, 303, 456 S.E.2d 534, 536 (1995). In the absence of any particular information, Samuels lacked a reasonable, articulable suspicion that Washington, when he opened the door, was fleeing, was involved in a criminal offense, or was armed and dangerous.

The majority asserts that the officers acted in good faith. I respectfully disagree. The officers had no basis, reasonable or otherwise, to conclude that the person who opened the door at Washington's residence was Ford. They had never seen Ford and had no description of Ford. They had no reliable information that Ford was in the residence. The officers cannot bootstrap reasonable suspicion from good faith reliance on a tip totally devoid of any indicia of reliability. Certainly, good faith is not established by ignorance or even innocent disregard of

well-established Fourth Amendment principles.  The officers had no authority to detain any man they met at the residence on the chance they might be lucky and find Ford.

"Th[e] demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme] Court's Fourth Amendment jurisprudence." Terry, 392 U.S. at 21 n.18.  Based upon the scant, unverified information provided by the informant, I would hold that Samuels lacked a reasonable suspicion to believe that Ford could be found at 2347 Bethel Street, that Washington was Ford, or that Washington was involved in a criminal offense.  Accordingly, the detention and frisk of Washington was unlawful.

                            III.

     Citing Barnes v. Commonwealth, 234 Va. 130, 360 S.E.2d 196 (1987), the Commonwealth initially argued at the three-judge panel hearing that the officers had a "limited authority to enter [Washington's residence] pursuant to the capias."  I disagree. Even if the police had been armed with an arrest warrant for Ford and had a reasonable basis to believe he was in the residence, they still would have needed a search warrant to lawfully enter Washington's residence to arrest Ford.  "[T]he entry into a home [of a person not named in an arrest warrant] to . . . make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a [search] warrant."  Steagald v. United States, 451 U.S. 204, 211 (1981).
     The Fourth Amendment protects the

individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home -- a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

Payton v. New York, 445 U.S. 573, 589-90 (1980) (citation omitted). Thus, "to the extent that [an arrest warrant] is invoked as authority to enter the homes of third parties," that entry is violative of the Fourth Amendment rights of those third parties. Steagald, 451 U.S. at 220.

At the en banc hearing, the Commonwealth abandoned that argument and contended that Samuels' entry into the residence was justified because of "the potential for danger." No evidence supports that argument. In fact, the officers had no information that Washington's residence was Ford's home. When the officers went to Washington's residence, none of them knew whether Ford had originally been charged with a felony or a misdemeanor. They only knew that a capias had been issued for Ford's detention. Indeed, the trial judge found that "Officer Samuels did not know whether it was a felony warrant or not, and I know there was a

capias, but I don't know . . . what the capias was for, other than failure to appear."

Samuels justified his entry on the grounds that he "needed to know who [Washington] was" and that he considers "everybody to be dangerous."  Thus, by Samuels' own testimony, his detention of Washington supplied the basis for concluding danger existed and the justification for the search of and entry into Washington's residence.  Until today, that generalized, subjective judgment has never been sufficient to justify a warrantless search of or entry into a private residence.

In upholding the officer's warrantless entry into Washington's residence, the majority fails to recognize that even if Samuels had a legitimate need to verify Washington's assertion that he was not Ford, Samuels was not privileged to enter Washington's residence.  Washington identified himself to Samuels.  The bondsman, who could identify Ford, was on the scene.  In view of these circumstances, the conclusion easily and necessarily follows that the officers unreasonably entered Washington's residence.  "'Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed "arrests" or "investigatory detentions."'"  Dunaway v. New York, 442 U.S. 200, 214-15 (1979) (citation omitted).  "[T]he Fourth Amendment's command that searches be 'reasonable' requires that when the State seeks to intrude upon an area in which our

society recognizes a significantly heightened privacy interest, a more substantial justification is required to make the search 'reasonable.'" Winston v. Lee, 470 U.S. 753, 767 (1985). "At the very core [of the Fourth Amendment] stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (citation omitted). Because of the sanctity of the home, "neither reasonable suspicion nor probable cause would suffice to permit the officers to make a warrantless entry into a person's house for the purpose of obtaining fingerprint identification." Hayes v. Florida, 470 U.S 811, 817 (1985). That the identification the officers sought was of another form does nothing to legitimize their entry.

The other basis that the majority relies upon to justify the entry, the officer's safety, is also unconvincing. Samuels lacked a reasonable basis to conclude that Washington was dangerous. Nothing about Washington or his conduct indicated that he posed a danger to the officers. Samuels' generalized belief that everyone is dangerous did not allow him to enter Washington's residence at his whim. "[A]n officer may not justify a protective search by using legitimate safety concerns to bootstrap his or her lack of sufficient suspicion of criminal

activity." <u>Reittinger v. Commonwealth</u>, 28 Va. App. 80, 92, 502 S.E.2d 151, 157 (1998).  Furthermore, it is clear that "any exigency arising from [Washington's] retreat was created solely by the police action in knocking on [Washington's] door." <u>State v. Morse</u>, 480 A.2d 183, 186 (N.H. 1984).  "Where agents create the exigency themselves, warrantless activity is per se unreasonable and we require suppression of any evidence obtained thereby." <u>United States v. Webster</u>, 750 F.2d 307, 328 (5th Cir. 1984).  <u>See</u> <u>also</u> <u>United States v. Roselli</u>, 506 F.2d 627 (7th Cir. 1974) (agents knocking at apartment door and identifying themselves as police officers unnecessarily created emergency situation).

Because Samuels was not justified in stopping Washington in the first instance, his entry into Washington's house and search of the kitchen cannot be justified by fear that arose during the stop.  Although this Court ruled in <u>Servis v. Commonwealth</u>, 6 Va. App. 507, 519, 371 S.E.2d 156, 162 (1988), that "[o]nce an officer has lawfully stopped a suspect, he is 'authorized to take such steps as [are] reasonably necessary to protect [his and others'] personal safety," that rule cannot be used to justify the officer's entry into the residence of a person who is not wanted for a criminal offense solely because a police officer suspects that the person may be someone else.

> The state attempts to bootstrap the police officers' entry into Defendant's [home] by merging two independent doctrines <u>i.e.</u>, the stop and frisk doctrine with the emergency doctrine, in order to fill the gaps of one

doctrine with the arguably permissible scope of another. Thus, their "emergency" or exigent circumstance, is, in their words, the need to "neutralize" the area for their own protection while carrying on the questioning. We decline the invitation to stretch either of these doctrines in order to justify the police officers' actions based on the facts presented here. Such a modification or blending of the two doctrines would create an exception to the warrant requirement which would effectively swallow the rule.

The very purpose of our constitutional provision was to protect a person's home from governmental intrusions. This right against intrusion should be stringently protected by the courts. As such, any exceptions to the warrant requirement should be narrowly and carefully drawn. The state's proposed rule that police officers, having authority to encounter a defendant and make reasonable inquiry, are thereby entitled to enter a defendant's premises in order to serve the needs of their safety, would be contrary to this principle of carefully drawn exceptions.

We are mindful of the dangers inherent in the work of police officers. The potential for violence exists in all confrontations between police and private citizens. But a remote possibility of harm to the police officers cannot justify a warrantless entry into the private recesses of one's house.

State v. Davis, 666 P.2d 802, 812 (Or. 1983) (citations omitted).

For these reasons, I would reverse the trial judge's refusal to suppress the evidence. The illegal entry and search of Washington's house was a product of the illegal detention and resulted in the unlawful acquisition of evidence. That evidence should have been suppressed. See Walls v. Commonwealth, 2 Va. App. 639, 651, 347 S.E.2d 175, 182 (1986).