COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, O'Brien and AtLee
Argued at Norfolk, Virginia

UNPUBLISHED

GARRETT LAMAR PORTER

v.        Record No. 0189-18-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE RICHARD Y. ATLEE, JR.
JULY 30, 2019

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Joel P. Crowe, Judge[1]

W. McMillan Powers, Assistant Public Defender, for appellant.

Victoria Johnson, Assistant Attorney General (Mark R. Herring,
Attorney General; Rachel L. Yates, Assistant Attorney General, on
brief), for appellee.

The Circuit Court of the City of Portsmouth found appellant Garrett Lamar Porter guilty

of possession of heroin with intent to distribute. On appeal, Porter argues that the circuit court

erred in denying his motion to suppress because the evidence was obtained through a search that

violated Porter's Fourth Amendment rights. For the following reasons, we reverse.

I. BACKGROUND

On appeal, we view the evidence in the light most favorable to the Commonwealth, the

party who prevailed before the circuit court. Clanton v. Commonwealth, 53 Va. App. 561, 564

(2009) (*en banc*).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Judge Johnny E. Morrison presided over both the hearing on the motion to suppress and
trial; however, Judge Crowe presided over sentencing, and signed both the final conviction and
sentencing orders.

While on patrol, Officers Adams and Siniscalchi of the Portsmouth Police Department, as part of their routine, went to observe a "hot spot" near the Howie's Food Mart on the corner of Dixie Avenue in Portsmouth. The police had previously received numerous complaints about this area and had made "drug arrests, recovered firearms, and even found caps" of narcotics on the ground in that area. Adams, who frequently testified as an expert in narcotics, said that, based on his training and experience, the location was known as an "open-air drug market" and qualified as a "high crime and drug" area. There were also frequent complaints of trash piling up. Adams explained that the officers would observe from a distance, and if nothing seemed amiss, would continue on their patrol.

On this occasion, Adams and Siniscalchi were in one vehicle observing; two additional pairs of officers were also present in the area. Adams observed Porter approach and speak with two individuals on the corner. One of the men noticed the patrol vehicle, and the officers decided to approach and speak with the men. Adams explained to them that there were complaints about the scattered trash and said that the men needed to get a bag and clean it up.

Adams was familiar with the two men Porter approached and had numerous prior contacts with them, but he did not recognize Porter. Adams said to Porter, "[h]ey I don't know you. What's your name?" Porter replied "John Saunders." Adams asked for "Saunders's" date of birth and social security number. Porter provided only three digits of his social security number and said he did not know the rest. Adams noted that "when I asked him his Social, he didn't know it. Now, all of a sudden, he doesn't want to be part of this engagement." Adams, based on his training and experience, testified that Porter not providing a full social security number, along with Porter's change in demeanor from being cooperative to withdrawing from the interaction, "usually meant" an individual had one or more warrants out for their arrest.

Porter started to walk away so Adams told him to "hang tight for a minute." Further, Adams testified that he "might have made the statement to him, you know, generally, once he gave me his Social, you know, 'Hang tight, because I'm walking back to my car to run it. If you have no warrants, you're on your way, awesome, no harm, no foul.'" Adams returned to the police cruiser to look up the information Porter provided, while Siniscalchi continued to speak with Porter. No information came back on the information Porter provided, meaning there were no notes, prior contacts, arrests, or traffic tickets in the system matching that identification. This, in Adams's experience, was unusual and suggested to him that Porter provided false information.

Adams returned to speak with Porter. While there, he saw a cap from a syringe on the ground and noted aloud to Porter that "these are the type of things . . . . There is a top of a needle right here on the ground."[2] Porter walked over and went to pick it up. Adams told Porter, "Hey, don't pick that up. It's dirty, and just relax." As Porter reached for the needle cap, Adams saw "[w]hat appeared to be a bag of heroin" start to fall from Porter's right sweatshirt sleeve. Although Adams could not see the whole bag, he observed that it contained at least twenty to twenty-five capsules.

Adams watched Porter "steadily . . . trying to back up" from the officers while making a flicking motion with his hand to get the bag back up his sleeve. Adams believed Porter did not know that Adams had seen the bag and thus kept his tone friendly so the situation would not escalate. He asked for Porter's name again, and asked if he had any weapons on him. Adams told Porter "I'm just going to pat you down." Porter continued to back up. Adams reached for Porter's sleeve; Porter resisted and pulled away. Adams "ended up taking Mr. Porter to the

---

[2] Although Adams did not elaborate, it seems he was pointing to this as an example for why law enforcement received complaints about the area and why the trash needed to be contained.

ground" in order to retrieve the bag containing heroin. The bag was later confirmed to contain sixty-four capsules of heroin.

Porter filed a motion to suppress the evidence on the grounds that Porter was unlawfully seized at the time Adams saw the bag of heroin. The parties appeared for a hearing on the motion to suppress, which the judge denied. The circuit court granted a subsequent motion to vacate because it came to light that the presiding judge had previously represented Porter decades ago. Upon rehearing by another judge from the circuit court, Porter's motion to suppress was again denied. During these hearings, and again at trial, the circuit court observed body camera footage from Adams's encounter with Porter, although this footage was never entered into evidence and is not a part of the record on appeal. After trial, the circuit court convicted Porter of possession of heroin with intent to distribute. Porter received a sentence of eight years in prison, with three years suspended. This appeal followed.

## II. ANALYSIS

This case turns on a narrow issue: was Porter seized for Fourth Amendment purposes when Adams told him to "hang tight for a minute" while going to look up the identification information Porter provided. If so, the officers would have needed reasonable suspicion that criminal activity was afoot or probable cause in order for that seizure to be lawful. Ewell v. Commonwealth, 254 Va. 214, 216-17 (1997).

Porter acknowledges that, prior to Adams saying "hang tight," the encounter was consensual. Because the standard for probable cause is more demanding than that for a brief seizure based upon reasonable suspicion, we focus our analysis on the latter. See id. at 217 ("In order to justify the brief seizure of a person by an investigatory stop, a police officer need not have probable cause; however, he must have 'a reasonable suspicion, based on objective facts,

that the [person] is involved in criminal activity.'" (alteration in original) (quoting Brown v. Texas, 443 U.S. 47, 51 (1979))).

"When a court reviews whether an officer had reasonable suspicion to temporarily detain a person, it must view the totality of the circumstances and view those facts objectively through the eyes of a reasonable police officer with the knowledge, training, and experience of the investigating officer." Matthews v. Commonwealth, 65 Va. App. 334, 346 (2015). "To establish reasonable suspicion, an officer must be able to articulate more than an unparticularized suspicion or 'hunch' that criminal activity is afoot." Rudolph v. Commonwealth, 277 Va. 209, 210 (2009).

Here, the only evidence of criminal activity Adams possessed at the time he made the "hang tight" request was that Porter was present in a high crime and drug area and that he did not know his social security number. Adams did not yet know that Porter had provided a false name or observe the bag of heroin until after making that request. Although these circumstances, in Adams's experience, indicated a possible attempt to evade a warrant for arrest, we cannot say that it is sufficient to provide reasonable suspicion that Porter was engaged in criminal activity. We thus must consider whether Adams's words, as well as other circumstances, made it so that a reasonable person in Porter's situation would not feel free to leave.

Whether "evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact." Id. Thus, "an appellate court must give deference to the factual findings of the circuit court and give due weight to the inferences drawn from those factual findings; however, the appellate court must determine independently whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." Robertson v. Commonwealth, 275 Va. 559, 563 (2008).

"A seizure occurs when by physical force or show of authority and submission thereto, an individual's freedom of movement is restrained and the person is not free to leave." Washington v. Commonwealth, 29 Va. App. 5, 10-11 (1999). Our Supreme Court has previously held that a defendant was not seized when an officer "put a big floodlight on [the defendant and his companion] . . . and told [them] to come here, said you two, come over here," and then asked for identification and if they had been drinking. Baldwin v. Commonwealth, 243 Va. 191, 194 (1992) (all but first alteration in original). In so ruling, the Court noted that many elements that speak to seizure, even when the person does not attempt to leave, were absent, such as a "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. at 196 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)). In finding that Baldwin was not seized for Fourth Amendment purposes, the Court emphasized that the directive issued did not constitute "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. at 199. It also noted that other elements, such as the use of the floodlight, did not amount to an "'intimidating' show of authority." Id. (quoting Michigan v. Chesternut, 486 U.S. 567, 575 (1988)).

We find that the circumstances here are distinguishable from Baldwin. First, while the officer was calling to the defendant from afar in Baldwin, here, Porter was already in the immediate presence of the officers, engaged in conversation with them. Furthermore, multiple officers were present in the area, with at least two directly interacting with Porter and a total of six officers within a one-block radius. In addition, Adams observed that Porter's demeanor changed when he was asked for his social security number and that "all of a sudden, he d[id]n't

want to be part of this engagement" and, in fact, started to walk away until Adams said to "hang tight."

Of course, the key consideration is how a reasonable person would have understood Adams's words "hang tight for a minute." Unlike in the case before us, there was no footage in Baldwin played in the trial court showing the exact words the officer used — the Court had to rely solely on subsequent characterizations from witnesses.[3] By contrast, the record here contains the exact words Adams spoke because the body camera footage was played repeatedly and quoted in the trial transcripts, and Adams testified as to what he said after refreshing his recollection by watching the footage.

There is no doubt that the language Adams used — "hang tight" — is that of a command; Adams's use of a colloquial phrase or friendly tone does not change the fact that his words would be conventionally interpreted as a directive to "stay here." Hang Tight, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/hang%20tight (last visited July 29, 2019) (defining "hang tight" as an informal phrase meaning "to wait before doing anything"). Adams also testified that he told Porter that he was "walking back to my car to run [his information]" and that if Porter "ha[d] no warrants, you're on your way, awesome, no harm, no foul." Any reasonable person in Porter's position would have taken this to mean that not only was he expected to remain on the scene, but also that Adams had established the condition under

---

[3] Baldwin's testimony in his defense was that the officer "told [them] to come here, said you two, come over here." 243 Va. at 194 (alteration in original). At trial, the officer "acknowledged that 'maybe [he] did call towards—call for them'" and ask them some questions. Id. (alteration in original). Baldwin's companion testified that "the officer came out and asked [them] to come towards . . . him and he asked [them] some questions." Id. (alterations in original).

Although the Court later characterized the language as the officer having "told the couple to 'come over here,'" id. at 199, we note that the alternative characterizations of "call[ing]" and "ask[ing]" carry less of a tone of command. Furthermore, focusing on those characterizations from the prosecution's witnesses, as opposed to Baldwin's testimony in his defense, also would be consistent with construing the facts in the light most favorable to the Commonwealth.

which he would be free to leave — confirmation that he had no warrants out for his arrest. At that point, the interaction was no longer consensual and Porter was seized for Fourth Amendment purposes. Because Adams did not possess reasonable suspicion or probable cause that Porter was engaged in criminal activity at the time he commanded Porter to "hang tight," the seizure was unlawful. As such, the trial court erred in denying Porter's motion to suppress the evidence obtained subsequent to that unlawful seizure.

### III. CONCLUSION

The circuit court erred in finding that Porter was not seized for Fourth Amendment purposes at the time the bag containing heroin was discovered. Thus, it should have granted Porter's motion to suppress. We reverse Porter's conviction and remand for further proceedings if the Commonwealth be so inclined.

<u>Reversed and remanded.</u>