UPON REHEARING EN BANC
KELSEY, Judge.
The trial court found the appellant, Jerald Lorenzo Jackson, guilty of possession of cocaine (Code § 18.2-250), possession of *220 a concealed weapon (Code § 18.2-308), and possession of a firearm while simultaneously possessing illegal drugs (Code § 18.2-308.4(A)). On appeal, Jackson challenges only the trial court’s denial of his pretrial suppression motion. A divided panel of the Court affirmed the conviction. Jackson v. Commonwealth, 39 Va.App. 624, 576 S.E.2d 206 (2003). Upon rehearing the matter en banc, we likewise affirm the trial court, finding no error in either its analysis or conclusion.
I.
On appeal from a denial of a suppression motion, we must review the evidence in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences. Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000); Sabo v. Commonwealth, 38 Va.App. 63, 69, 561 S.E.2d 761, 764 (2002).
At 2:10 a.m. on June 17, 2001, the Newport News Police Department dispatched Officer M.A. Cook to a street corner next to a “small bar” to investigate an anonymous complaint. The caller reported (and the dispatcher advised the responding officers) that “three black males” were acting disorderly and “at least one of them had a firearm and was brandishing it.” The caller also stated that the three “were getting into a car and leaving.” The caller described the vehicle as a “white Honda.” Sending backup, the police interpreted the report as “a high risk situation with a gun possibly involved.”
Three to five minutes later, Cook and other officers arrived at the scene and observed a white Honda leaving the area. They saw no other white vehicles of any type. The white Honda “pulled out right in front” of Cook, permitting the headlights of his police cruiser to shine directly into the vehicle. Cook clearly saw three black males in the white Honda. On the basis of the brandishing tip, the officers followed the vehicle and stopped it several blocks away.
Cook approached the car and explained the reason for the stop. Sergeant James Hogan went to the passenger side of the vehicle and shined a light into the car. Jackson sat in the *221 front passenger seat with his arms folded across his stomach. Hogan noted an unusual bulge underneath Jackson’s shirt, which the officer suspected to be a firearm. The bulge, Hogan concluded, “obviously was not part of his body” and was “too big” to be anything other than a handgun.
Hogan asked Jackson if he had a gun on him. Jackson said no. Hogan then said, “Could you pull your shirt up so that I can be comfortable with us talking, because I believe you have a firearm?” In response, Jackson pulled his shirt “a couple inches and put it back” and then “crossed his arms back across his stomach.”
Fearing for his safety, Hogan unholstered his sidearm and ordered Jackson out of the car. After Jackson got out of the vehicle, Officer B.D. Bartley immediately conducted a weapons search and removed a Glock, .40 caliber, semiautomatic handgun from Jackson in the exact area of the previously noticed bulge. The officers then handcuffed Jackson and placed him under arrest. In a search incident to his arrest, the officers also found crack cocaine in Jackson’s pants pocket.
II.
At trial, Jackson moved to suppress the evidence, claiming that the police officers (i) lacked a sufficient basis to stop the white Honda and to question its occupants, and (ii) had equally insubstantial grounds for searching him for weapons or drugs. Both events, Jackson contended, violated search and seizure principles protected by Virginia law and the United States Constitution.[1]
*222 The trial court denied the motion, stating that the officers had “an obligation to protect the citizens of this community” and would have been “derelict in their duty” had they not acted as they did. The procedures they followed, the trial judge concluded, were “strictly by the book.” For the following reasons, we agree with the trial court and affirm its decision.
A.
Though the ultimate question whether the officers violated the Fourth Amendment triggers de novo scrutiny, we defer to the trial court’s findings of “historical fact” and give “due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.” Davis v. Commonwealth, 37 Va.App. 421, 429, 559 S.E.2d 374, 378 (2002) (citing Neal v. Commonwealth, 27 Va.App. 233, 237, 498 S.E.2d 422, 424 (1998)). Viewing the case through this evidentiary prism, we examine the trial court’s factual findings to determine if they are plainly wrong or devoid of supporting evidence. See Mier v. Commonwealth, 12 Va.App. 827, 828, 407 S.E.2d 342, 343 (1991). The appellant must shoulder the “burden” of showing that the trial court’s decision “constituted reversible error.” McGee v. Commonwealth, 25 Va.App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (citations omitted); see also Davis, 37 Va.App. at 429, 559 S.E.2d at 378.
B.
The Fourth Amendment “does not proscribe all seizures, only those that are ‘unreasonable.’ ” Hodnett v. Commonwealth, 32 Va.App. 684, 690, 530 S.E.2d 433, 436 (2000) (quoting Welshman v. Commonwealth, 28 Va.App. 20, 30, 502 S.E.2d 122, 126-27 (1998) (en banc)), see also Hamlin v. Commonwealth, 33 Va.App. 494, 499, 534 S.E.2d 363, 365 (2000). The Constitution simply “does not proscribe reason *223 able searches and seizures.” Barkley v. Commonwealth, 39 Va.App. 682, 691, 576 S.E.2d 234, 238 (2003). The text of the Fourth Amendment draws the line there; so too must the courts.
In this context, reasonableness depends on the extent of the individual’s loss of freedom caused by the seizure and the objective reason for it. A full custodial arrest requires a showing of probable cause. When police officers merely stop an automobile, however, they need only have a reasonable, articulable suspicion that the driver is unlicensed, the automobile unregistered, or the “person stopped may be involved in criminal activity.” Bass, 259 Va. at 474-75, 525 S.E.2d at 923-24 (citations omitted).[2] Actual proof that “criminal activity is afoot is not necessary,” only that it “may be afoot.” Harmon v. Commonwealth, 15 Va.App. 440, 444, 425 S.E.2d 77, 79 (1992); see also United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002); Hamlin, 33 Va.App. at 501, 534 S.E.2d at 366. Though an officer’s reliance on a mere hunch cannot justify a stop, “the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.” Arvizu, 534 U.S. at 274, 122 S.Ct. at 751.[3]
*224 Under equally settled principles, “anonymous information that has been sufficiently corroborated may furnish reasonable suspicion justifying an investigative stop.” Bulatko v. Commonwealth, 16 Va.App. 135, 137, 428 S.E.2d 306, 307 (1993) (citing Alabama v. White, 496 U.S. 325, 331, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990)). “An informant’s tip can provide the justification for a Terry stop even if the informant’s reliability is unknown and certainly can do so if, as here, the information is corroborated.” Washington v. Commonwealth, 29 Va.App. 5, 11, 509 S.E.2d 512, 515 (1999) (en banc) (citation omitted). “Anonymous information sufficiently corroborated may give reasonable suspicion for an investigative stop although the unverified tip by itself would not justify a forcible stop.” Washington, 29 Va.App. at 12, 509 S.E.2d at 515.
Described as “the classic case on the value of corroborative efforts of police officials,” Illinois v. Gates, 462 U.S. 213, 242, 103 S.Ct. 2317, 2334, 76 L.Ed.2d 527 (1983), the United States Supreme Court decision in Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), involved a known informant who reported that the suspect would be arriving on a particular train, wearing certain kinds of clothes, carrying particular pieces of luggage, would walk briskly, and “would be carrying a quantity of heroin.” Gates, 462 U.S. at 242, 103 S.Ct. at 2334. The informant “gave no indication of the basis for his information.” Id. The police verified all of these details except the allegation that the suspect had “heroin on his person or in his bag.” Gates, 462 U.S. at 243, 103 S.Ct. at 2334. By itself, however, this omission did not invalidate the reliability of the tip. As the Supreme Court explained,
with every other bit of [the informant’s] information being thus personally verified, [the officer] had “reasonable grounds” to believe that the remaining unverified bit of [the informant’s] information — that [the suspect] would have the heroin with him — was likewise true.
*225 Id. (quoting Draper, 358 U.S. at 313, 79 S.Ct. at 333); see also Boyd v. Commonwealth, 12 Va.App. 179, 189, 402 S.E.2d 914, 920 (1991) (“The verification of the personal information becomes, then, but another circumstance the [officer] may consider in determining whether the informer is to be believed. It is a factor which reduced the chances that [the informer’s report was] a reckless or prevaricating tale.” (citing Gates, 462 U.S. at 244-45, 103 S.Ct. at 2335) (internal quotations omitted)).
The Fourth Amendment has never required that the same inflexible rule of reliability be applied to all cases involving informants. “Rigid legal rules are ill-suited to an area of such diversity. ‘One simple rule will not cover every situation.’ ” Gates, 462 U.S. at 232, 103 S.Ct. at 2329 (quoting Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972)). Even the reasonable suspicion standard itself, a “somewhat abstract” and “ ‘elusive concept,’ ” cannot be reduced to a “ ‘ “neat set of legal rules.” ’ ” Arvizu, 534 U.S. at 274, 122 S.Ct. at 751 (quoting Ornelas v. United States, 517 U.S. 690, 695-96, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996), and Gates, 462 U.S. at 232, 103 S.Ct. at 2329 (additional citation omitted)). Given the flexibility inherent in the concept of reasonableness, the level of corroboration required by the Fourth Amendment depends on commonsense principles. In this case, three such principles stand out.
First, citizens who witness a crime in progress are presumed personally reliable, and thus, courts do “not apply to citizen informers the same standard of reliability as is applicable when police act on tips from professional informers or those who seek immunity for themselves.... ” Guzewicz v. Commonwealth, 212 Va. 730, 735-36, 187 S.E.2d 144, 148 (1972). Information from a “disinterested citizen” who claims to be an eyewitness of a crime may be given more weight than “information from a ‘criminal’ informer, whose motives are less likely to be pure.” Reed v. Commonwealth, 36 Va.App. 260, 267-68, 549 S.E.2d 616, 619-20 (2001); see also McCreary v. Sigler, 406 F.2d 1264, 1269 (8th Cir.1969) (“Probable cause *226 for an arrest may exist where an unknown citizen makes complaints, as a victim or eyewitness to a crime, where the underlying circumstances demonstrate his first-hand personal knowledge.”).
Put another way, a call from a concerned citizen who witnesses a crime requires not so much “personal reliability” of the observer, but “observational reliability” of his observations. State v. Walshire, 634 N.W.2d 625, 629 (Iowa 2001); see also State v. Williams, 241 Wis.2d 631, 623 N.W.2d 106, 115, cert. denied, 534 U.S. 949, 122 S.Ct. 343, 151 L.Ed.2d 259 (2001). Observational reliability exists where the police can corroborate significant details, the corroboration takes place soon after the alleged observation, and the eyewitness report is something that could have been seen had it happened as described.[4] As we said in Beckner v. Commonwealth, 15 Va.App. 533, 537, 425 S.E.2d 530, 533 (1993), albeit in dicta, an anonymous report that a suspect is “displaying a gun” implies a “personal basis of knowledge” upon which reasonable officers may rely.
Second, the Fourth Amendment requirement of corroboration also takes into account whether the alleged illegality involves a concealed crime or an open and obvious crime. It matters a great deal if the illegality alleged in the tip “ ‘did not involve a concealed crime — a possessory offense.’ ” United States v. Wheat, 278 F.3d 722, 734 (8th Cir.2001) (quoting State v. Boyea, 171 Vt. 401, 765 A.2d 862, 875 (2000) (Skoglund, J., concurring)), cert. denied, 533 U.S. 917, 121 S.Ct. 2524, 150 L.Ed.2d 696 (2001). If what was “described in the police dispatch to the arresting officer was a crime in progress, carried out in public, identifiable and observable by *227 anyone,” the anonymous tip may not need the same species of corroboration required for reports of concealed crimes. Id.
In other words, what may be reasonable corroboration for tips alleging an open and obvious crime (particularly from a caller claiming to be an eyewitness) may be unsatisfactory for those asserting a concealed crime. For concealed crimes, the tip may need some insider information capable of predicting the suspect’s actions. This conclusion stems from the truism, noted in White, 496 U.S. at 332, 110 S.Ct. at 2417, that when a tipster has knowledge of information about the suspect which the “general public would have no way of knowing,” then it can be reasonably inferred that the tipster “is likely to also have access to reliable information about that individual’s illegal activities.” In such cases, the tip becomes more reliable to the extent it reveals “inside information” demonstrating a “special familiarity” with the suspect’s affairs. Id.
When an anonymous caller reports an open and obvious crime (like when a suspect brandishes a weapon or, for that matter, shoots someone), the Fourth Amendment may require no showing that the caller have inside information about the suspect capable of predicting his future conduct.[5] A “careful reading” of the United States Supreme Court’s cases shows that the “emphasis on the predictive aspects of an anonymous tip may be less applicable to tips purporting to describe contemporaneous, readily observable criminal actions .... ” Wheat, 278 F.3d at 734. In such cases, the duty to corroborate focuses mainly on whether the tipster has accurately identified the suspect and described the illegality. “Al *228 most always, it comes from his eyewitness observations, and there is no need to verify that he possesses inside information.” Id.
Third, the reasonable corroboration standard also takes into account the seriousness of the danger posed by the alleged illegality. On several occasions “we have recognized a fine of cases where courts have found reasonable suspicion for an investigatory stop when the public is in imminent danger, despite the fact that the stop is based on information provided by an anonymous informant who has not provided any basis of knowledge.” Scott v. Commonwealth, 20 Va.App. 725, 728, 460 S.E.2d 610, 612 (1995) (citations omitted); see also Ramey v. Commonwealth, 35 Va.App. 624, 633, 547 S.E.2d 519, 524 (2001) (“We have applied an imminent danger standard in reviewing the sufficiency of an anonymous tip where there is a contemporaneous description of dangerous criminal activity such as brandishing a firearm in a public place.”). In such cases, the “imminent public danger” may provide ample justification for an “immediate investigation.” Beckner, 15 Va. App. at 538, 425 S.E.2d at 534; cf. Giles v. Commonwealth, 32 Va.App. 519, 524-25, 529 S.E.2d 327, 330 (2000) (considering the “imminence of serious and perhaps lethal danger” as a factor in Terry stop analysis).
C.
In light of these principles, we reject Jackson’s argument that the police had no authority to stop the white Honda and to question its occupants. The officers received a dispatch stating that three black males in a white Honda had been observed acting disorderly and one had been seen “brandishing” a firearm. On its face, the report alleged open and obvious criminal behavior. Brandishing a firearm means displaying it “in such manner as to reasonably induce fear in the mind of another or holding] a firearm in a public place in such a manner as to reasonably induce fear in the mind of another of being shot or injured.” Code § 18.2-282(A). The ordinary meaning of the word tracks its statutory definition. *229 Brandishing a firearm means to “wave, shake, or exhibit in a menacing, challenging, or exultant way.” Webster’s New World Dictionary 170 (3d college ed.1988).
That leaves only one issue: Did the officers sufficiently corroborate the information in the call? The trial court correctly found that they did. The caller reported six significant details: the make of the vehicle (Honda), its color (white), its location (leaving the bar), the number of the occupants in the car (three), the race of each of the occupants (black), and the gender of each of the occupants (males). Having corroborated each of these details, within minutes of the original report, the police had an objectively reasonable belief that the remaining portion of the tip — that one of the suspects had brandished a firearm only moments before — was likewise true. It is hardly unreasonable to believe that because an informant is “right about some things, he is more probably right about other facts,” including the assertion that the suspect is engaged in “illegal activity.” Gates, 462 U.S. at 244, 103 S.Ct. at 2335 (quoting Spinelli v. United States, 393 U.S. 410, 427, 89 S.Ct. 584, 594, 21 L.Ed.2d 637 (1969) (White, J., concurring)).
Although the information came from a concerned citizen making an anonymous call to the police, this fact strengthens, not weakens, the reliability of the tip. No information suggests the unknown caller was a paid informant or a known criminal tipster. More important, the caller claimed he observed one of the disorderly suspects “brandishing” the weapon and then “getting into a car and leaving.” The caller described the events in the first person, reporting his personal observations about events then occurring. The tip in our case, moreover, involved an open and obvious illegality. By definition, brandishing must be visible. Thus, anyone outside the bar (or inside the bar looking out the window) could have seen it.[6]
*230 Jackson’s argument to the contrary fails to calibrate his disagreement at the relevant level of persuasion. For a mere investigatory detention, the Fourth Amendment does not require a showing that the suspicion of illegality be more likely true than not. Arvizu, 534 U.S. at 273-74, 122 S.Ct. at 750-51. Nor, for that matter, need there be even the lesser showing that probable cause exists for such a belief. Id. There simply must be a reasonable suspicion, not one based on a mere guess or instinctual hunch. The sufficiency of the corroboration, therefore, need only be great enough to elevate the suspicion from an unfounded supposition to a reasonable one.
Jackson contends our reasoning has been undermined by Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). We disagree. The only “question presented” in that case — according to the United States Supreme Court — was “whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer’s stop and frisk of that person.” Id. at 268, 120 S.Ct. at 1377 (emphasis added); see also Commonwealth v. Hill, 264 Va. 541, 545, 570 S.E.2d 805, 807 (2002). The anonymous call reported only “that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun.” J.L., 529 U.S. at 268, 120 S.Ct. at 1377. As J.L. correctly put it, the “tipster did not even allege that a crime was being committed.” Brief for Respondent, Florida v. J.L., 1998 U.S. Briefs Lexis 1993 at *4 (Jan. 25, 2000).
In other words, the tip in J.L. did not contain “a specific description of dangerous criminal conduct either under way or likely to occur.” Ramey, 35 Va.App. at 633, 547 S.E.2d
*231 at 524 (describing the deficiency in the J.L. tip). Reasonable suspicion “requires that a tip be reliable in its assertion of illegality,” not just in its ability to identify a particular suspect. Hill, 264 Va. at 545, 570 S.E.2d at 807 (quoting J.L., 529 U.S. at 272, 120 S.Ct. at 1379). The holding of J.L. turns on this very point:
An accurate description of a subject’s readily observable location and appearance is of course reliable in this limited sense: It -will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be rehable in its assertion of illegality, not just in its tendency to identify a determinate person.
J.L., 529 U.S. at 272, 120 S.Ct. at 1379 (emphasis added). J.L. cited with approval a leading text that distinguishes “reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases.” Id. (summarizing 4 W. LaFave, Search and Seizure § 9.4(h), at 213 (3d ed.1996)).
This fact alone distinguishes J.L. from our case. Absent some disqualifying status (being a felon, juvenile, or drug possessor) or situs (being in a place where weapons are forbidden), it is not a crime to possess a weapon. The tipster in J.L., therefore, made no reliable assertion of illegality.[7] On the other hand, no matter one’s status or situs, it is a crime to brandish a firearm in a public place. And that is exactly what the tipster in our case asserted in a contemporaneous, eyewitness report. We thus see a substantial difference between the *232 tip in J.L. (a man is carrying a gun) and the tip in our case (a man is pointing a gun at people).[8]
The “carrying a gun” shorthand expression in J.L., moreover, should not be mistakenly interpreted as “brandishing” a gun. The Florida Supreme Court, affirmed by the United States Supreme Court, made clear that the officers “received an anonymous tip that a young man was carrying a concealed weapon.” J.L. v. Florida, 727 So.2d 204, 207 (Fla.1998) (emphasis added). The Florida Court of Appeals also confirmed that the “police received an anonymous complaint that a concealed weapon violation was taking place.” Florida v. J.L., 689 So.2d 1116, 1117 (Fla.Dist.Ct.App.1997) (emphasis added). The United States Supreme Court granted certiorari on a single question presented, whether a tip alleging “a person is carrying a concealed firearm” passed the reliability test. Brief for Petitioner, Florida v. J.L., 1998 U.S. Briefs Lexis 1993 at *i (Dec. 23, 1999) (emphasis added). Not one time in any of the judicial opinions or legal briefs accompanying J.L. to the United States Supreme Court did anyone assert that the tip in J.L. involved a complaint of brandishing.
In addition to alleging a specific illegality, the brandishing tip in our case has another characteristic that distinguishes it from J.L. Even if the J.L. tip had alleged a specific illegality (like, for example, if the tip had said the suspect had both a weapon and illegal drugs on him at that bus stop),[9] the *233 illegality would have been concealed. In contrast, the tip in our case involved an open and obvious illegality. Anyone watching the suspect could have seen him brandishing the firearm. It matters not that the anonymous caller did not have predictive information about the suspect. He was simply reporting what he saw. The United States Supreme Court in White “did not create a rule requiring that a tip predict future action, and neither did J.L.” Wheat, 278 F.3d at 734 (citation omitted). Nor do we. The consequences of such an inflexible rule would be unwise at best and dangerous at worse.
If we were to adopt such a rule, it would preclude a police officer from stopping a shooting suspect who is fleeing the scene of an alleged crime simply because the anonymous tip (reported by an alleged eyewitness providing a near-contemporaneous description of the suspect and the offense) did not recite any predictive information about the shooter. In such a case, what would matter to any reasonable officer (and, under the law, what should matter to any reasonable court) is whether the caller actually saw the shooter and the shooting, not whether the caller knows some intimate details of the shooter’s personal life. To reject this commonsense distinction between a concealed crime (which may require some showing of predictive quality to the tip) -and an open and obvious crime (which focuses only on observational reliability), as Jackson urges us to do, would hardly be in keeping with the rule of reason animating the Fourth Amendment.
An equally dispositive distinction between the J.L. tip and the tip in our case is that the brandishing tip in our case came from a caller making a contemporaneous report of observable events as an eyewitness. The tipster in J.L. did not state that he observed J.L. with the firearm. The fact is, the tip did not express or imply any first-person, present-tense observation of the reported facts. Like the officers in J.L., we are left to wonder whether the tipster saw anything himself or whether he simply made a wild (albeit accurate) guess that J.L. was *234 carrying a gun.[10]
Finally, we find the corroboration sufficient in light of the imminent danger to the public raised by the anonymous brandishing tip. In Scott, 20 Va.App. at 727, 460 S.E.2d at 611, an anonymous caller reported that he saw a man “brandishing a gun” in a laundromat. The caller gave a specific description of the man’s appearance. The police found the man a block away and took a firearm from him during a pat-down search. We held that the “imminent danger” posed by a suspect brandishing a firearm in a public place warranted the stop because of the enormous risk that, if the tip were true, innocent lives might be placed in immediate peril. Scott, 20 Va.App. at 728-29, 460 S.E.2d at 612-13.
The same conclusion reached in Scott must be reached here, a case where police officers received information from a concerned citizen about a suspect brandishing a firearm outside a bar at about 2:00 a.m. For the police not to act in such circumstances, the trial judge correctly observed, would have been a dereliction of duty. Whatever the appropriate level of Fourth Amendment scrutiny, it should not *235 permit (much less encourage) a law enforcement officer “ ‘to simply shrug his shoulders and allow a crime to occur or a criminal to escape.’ ” United States v. Montoya de Hernandez, 473 U.S. 531, 544, 105 S.Ct. 3304, 3312, 87 L.Ed.2d 381 (1985) (quoting Williams, 407 U.S. at 145, 92 S.Ct. at 1923); see also Simmons v. Commonwealth, 217 Va. 552, 554, 231 S.E.2d 218, 220 (1977); Christian v. Commonwealth, 33 Va. App. 704, 713, 536 S.E.2d 477, 482 (2000) (en banc).
For the same reasons we find unpersuasive the analogy between J.L. and the present case, we find it equally unconvincing as a basis for overruling Scott. Unlike Scott, the tip in J.L. did not involve a contemporaneous, eyewitness account, but rather a vague report providing absolutely no basis for the officers to discern the possible source of the caller’s information or its timeliness. Also unlike Scott, the tip in J.L. did not describe an open and obvious crime involving an imminent danger to public safety, but rather a concealed one (assuming any alleged illegality at all) implicating no immediate peril.
In sum, we find the brandishing tip in our case “rehable in its assertion of illegality,” J.L., 529 U.S. at 272, 120 S.Ct. at 1379, because this tip — unlike the “carrying a gun” tip in J.L. — provided information permitting the officers reasonably to infer that it (i) came from a concerned citizen making a contemporaneous, eyewitness report, (ii) involved an open and obvious crime rather than mere concealed illegality, and (iii) described criminality posing an imminent danger to the public. After corroborating a half-dozen specific details within minutes of the tip, the officers correctly concluded the totality of the circumstances raised a “reasonable suspicion to believe that criminal activity ‘may be afoot.’ ” Arvizu, 534 U.S. at 273, 122 S.Ct. at 750 (citations and quotation marks omitted).
In so holding, we find our views consistent with other appellate courts that have addressed specifically the distinguishing characteristics of the unreliable tip in J.L. See, e.g., Walshire, 634 N.W.2d at 627-28, 630 (“This case is different from J.L. in several respects, one of which is particularly important: the information provided here did not concern *236 concealed criminal activity, but rather illegality open to public observation.”); Williams, 628 N.W.2d at 114 (“Quite simply, in contrast to the tipster in Florida v. J.L., the tipster here has made plain that she is an eyewitness.”); State v. Rutzinski, 241 Wis.2d 729, 623 N.W.2d 516, 526 (2001) (“[U]nlike the caller in J.L., the informant in this case ... was making personal observations of Rutzinski’s contemporaneous actions.”); Boyea, 765 A.2d at 868 (distinguishing the tip in J.L. from tips asserting contemporaneous, eyewitness reports of open and obvious illegality); see also Wheat, 278 F.3d at 729-37 (surveying and concurring with cases that find J.L. distinguishable from cases involving eyewitness tips alleging contemporaneous and openly dangerous illegality).
D.
Even assuming the legality of the vehicle stop, Jackson still contends that no additional grounds existed for his warrantless search and detention. “When a police encounter goes beyond an investigatory detention,” Jackson argues, it “becomes a ‘seizure’ of the suspect” and “full probable cause is required for the seizure, not a mere showing of articulable suspicion.” In making this argument, Jackson views being questioned, ordered out of the vehicle (albeit at gunpoint), and frisked as an arrest. He also assumes that, under Fourth Amendment principles, all seizures must be arrests for purposes of triggering the probable cause requirement. We find merit in neither argument.
Investigatory detentions and arrests both involve Fourth Amendment seizures.[11] They are quite dissimilar, however, in actual practice and in legal principle. In an investigatory detention, an officer seeks to determine whether a crime has been, or is about to be, committed. The suspect’s *237 freedom to leave is impaired, but only temporarily. If the officer’s suspicions do not ripen into probable cause, the suspect must be promptly released once the purpose for the stop has been fulfilled. In contrast, an arrest is “ ‘the initial stage of a criminal prosecution.’ ” Hill, 264 Va. at 547, 570 S.E.2d at 808 (quoting Terry v. Ohio, 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968)). “After an arrest, a citizen’s liberty is completely constrained, at a minimum, until a judicial officer has determined the issue of bail.” Id. Thus, the “different consequences that attend an arrest and an investigative detention are manifest.” Id.
During an investigatory stop, the officer may conduct a pat-down search for his own safety if he has a reasonable belief that the person may be armed and dangerous. See Ybarra v. Illinois, 444 U.S. 85, 93-94,100 S.Ct. 338, 343-44, 62 L.Ed.2d 238 (1979). The officer need not be “absolutely certain that the person is armed.” Simmons, 217 Va. at 556, 231 S.E.2d at 221. “If he reasonably believes that the individual might be armed, the search is warranted to protect himself or others who may be in danger.” Id. (emphasis added).
In assessing whether a suspect may be armed and dangerous, an officer may consider “characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime.” Christian, 33 Va.App. at 714, 536 S.E.2d at 482 (footnote omitted). Courts assess reasonableness from the perspective of a reasonable officer on the scene, making allowance for the necessity of split-second decisions. See Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989).[12]
*238 In Scott, we approved a pat-down search of a suspect who had reportedly brandished a firearm in a public place. The report came from an anonymous source which identified only the suspect’s appearance and location. The weapons frisk was nonetheless “warranted for the officer’s protection and the protection of the public” given the immediate and potentially deadly risk the suspect posed. Scott, 20 Va.App. at 729-30, 460 S.E.2d at 613.
Here, a contemporaneous report by a concerned citizen said three black males in the white Honda had been disorderly and one of them had brandished a firearm. When questioned directly about having a gun, Jackson conspicuously attempted to hide under his crossed arms a bulge that a trained officer immediately believed to be a weapon. The officers, therefore, did not act unreasonably by suspecting the bulge “might be” a firearm. Simmons, 217 Va. at 556, 231 S.E.2d at 221.
We also reject Jackson’s argument that the investigatory detention and weapons frisk amounted to a full custodial arrest. To protect themselves during a valid Terry stop, police officers have a right to draw their weapons, to handcuff a suspect, or even to threaten to use force if the circumstances reasonably warrant it. See generally Thomas v. Commonwealth, 16 Va.App. 851, 857, 434 S.E.2d 319, 323 (1993), aff'd en banc, 18 Va.App. 454, 444 S.E.2d 275 (1994). A Terry stop involves “a police investigation ‘at close range,’ when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make ‘a quick decision as to how to protect himself and others from possible danger.’ ” Servis v. Commonwealth, 6 Va.App. 507, 519, 371 S.E.2d 156, 162 (1988) (quoting Michigan v. Long, 463 U.S. 1032, 1053, 103 S.Ct. 3469, 3483,. 77 L.Ed.2d 1201 (1983)) (emphasis in original). If a suspect is dangerous, “he is no less dangerous simply because he is not arrested.” Id. (internal quotations and brackets omitted).
*239 Coercive measures, therefore, do not “convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances.” Johnson v. Commonwealth, 20 Va.App. 49, 55, 455 S.E.2d 261, 264-65 (1995); see also Harris v. Commonwealth, 27 Va.App. 554, 566, 500 S.E.2d 257, 263 (1998). Police officers exceed their authority under Terry only when their methods go beyond that reasonably needed to “confirm or dispel” their suspicions. Hamlin, 33 Va.App. at 501-02, 534 S.E.2d at 366. Questions of scope, whether in terms of duration or the extent of coercion, must be referred back to the basic reasonableness standard. When “ ‘evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.’ ” Washington, 29 Va.App. at 15, 509 S.E.2d at 517 (quoting United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985)).
In this case, the officers ordered Jackson out of the car to frisk him only after they came to the reasonable conclusion that he was hiding a weapon — likely the very one that had been brandished earlier. The only way to confirm or dispel that suspicion was to conduct a limited weapons search. Given the circumstances they faced at that time of night, we find nothing unreasonable about the officers unholstering their weapons during the frisk and ordering Jackson out of the car. Thus, we reject Jackson’s contention that the officers went beyond the boundaries of Terry during their detention and weapons frisk of Jackson.
Having found the weapon, the officers had probable cause to believe Jackson was the black male who had reportedly brandished a firearm outside the bar. By placing him under arrest at that time, the officers gained the corollary authority to conduct a search incident to that arrest. United States v. Robinson, 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427 (1973) (“It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.”). For these reasons, *240 the trial court correctly refused to suppress either the weapon found during the pat down or the crack cocaine found during the search incident to arrest.
III.
Neither the initial stop of the white Honda, the investigatory detention and weapons frisk of Jackson, nor the search incident to Jackson’s arrest constitutes a violation of the Fourth Amendment’s proscription against “unreasonable searches and seizures.” The trial court, therefore, did not err in denying Jackson’s suppression motion.

Affirmed.

. See generally Code § 19.2-60 ("A person aggrieved by an allegedly unlawful search or seizure may move the court ... to suppress it for use as evidence.”). To the extent Jackson invokes constitutional guarantees arising under Article I, § 10 of the Virginia Constitution, the state law analysis tracks the federal law interpreting the Fourth Amendment of the United States Constitution. See Henry v. Commonwealth, 32 Va.App. 547, 551, 529 S.E.2d 796, 798 (2000). “Our courts have consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution.” Sabo, 38 Va.App. at 77, 561 S.E.2d at 768 (citation omitted); see also *222 Bennefield v. Commonwealth, 21 Va.App. 729, 739-40, 467 S.E.2d 306, 311 (1996).

. When police officers " 'stop a motor vehicle and detain an occupant, this constitutes a seizure of the person for Fourth Amendment purposes.’ ” Logan v. Commonwealth, 19 Va.App. 437, 441, 452 S.E.2d 364, 367 (1994) (quoting Zimmerman v. Commonwealth, 234 Va. 609, 611, 363 S.E.2d 708, 709 (1988)). After making a lawful stop of a vehicle and questioning its occupants, an officer may order a passenger out of the vehicle. See Maryland v. Wilson, 519 U.S. 408, 415, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997); Harris v. Commonwealth, 27 Va.App. 554, 561-63, 500 S.E.2d 257, 260-61 (1998); Welshman, 28 Va.App. at 31-33, 502 S.E.2d at 127-28; Hatcher v. Commonwealth, 14 Va.App. 487, 491-92, 419 S.E.2d 256, 258-59 (1992).

. See also Parker v. Commonwealth, 255 Va. 96, 104, 496 S.E.2d 47, 51-52 (1998) (recognizing that an investigatory detention may take place "even though there is no probable cause to make an arrest” (citing Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968))); Clarke v. Commonwealth, 32 Va.App. 286, 295, 527 S.E.2d *224 484, 488 (2000) (noting that the test for reasonable suspicion is "less stringent than the test for probable cause”).

. See, e.g., Gregory v. Commonwealth, 22 Va.App. 100, 107, 468 S.E.2d 117, 121 (1996) ("Accordingly, a detailed description, like that given here, by a caller who appears to have been a concerned citizen who recently observed a person hailing motorists to sell drugs, together with immediate verification of aspects of the description are important factors to consider in determining whether the officer had reasonable suspicion, even when the description contains facts that are ‘easily obtained.’ ”).

. We made a similar point in response to an appellant who argued that White established an inflexible rule that "information supplied to the government by an unidentified informant may not establish reasonable suspicion to effect an investigative stop, unless the information predicts the future actions of the individual stopped.” Beckner, 15 Va.App. at 535, 425 S.E.2d at 531. Our response was unequivocal: "We disagree with the appellant on this point. We believe that a finding of reasonable suspicion may be warranted in some circumstances, despite the unidentified informant not providing the government with information that predicts the future actions of the subject, if some other indicia of reliability of the informant exists.” Id.

. For these reasons, we do not see any favorable comparison between this case and Ramey, 35 Va.App. at 627, 547 S.E.2d at 521, where the anonymous tip did not involve either a contemporaneous or an eyewitness report. Instead, the tip in Ramey simply stated that a "black male *230 was 'somehow’ involved in a fatal gang shooting the previous day, but relayed no further information as to the source of the report or in what capacity the black male was involved in the shooting.” Id. We found this tip legally insufficient for fairly obvious reasons. An anonymous tip claiming a suspect had "somehow” committed a crime "the previous day,” however, is quite different from an eyewitness report that a suspect is committing a crime at that very moment — particularly when the police provide near immediate corroboration of a half-dozen observational details contained in the report.

. The officers in J.L. did not discover the illegality of J.L. "carrying a gun" until after they detained J.L. and determined he was a juvenile and, in any event, did not possess a concealed weapon permit.
That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.
J.L., 529 U.S. at 271, 120 S.Ct. at 1379.

. The reason J.L. nevertheless engaged the reliability analysis was because reasonable suspicion, under the totality of the circumstances test, requires that both "quantity and quality” factors be considered, allowing for the "requisite quantum” of one to affect necessarily the other. White, 496 U.S. at 330, 110 S.Ct. at 2416. A footnote in J.L. notes that the "mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a Terry stop without meeting the reliability requirement.” J.L., 529 U.S. at 273 n. *, 120 S.Ct. at 1380 n. *. This unremarkable proposition simply means that an anonymous tip must allege some illegality and be sufficiently reliable. The tip in J.L. satisfied neither of the two requirements, and the tip in our case satisfies both.

. Simultaneously possessing both a firearm and illegal drugs violates Code § 18.2-308.4(A).

. We do not consider Harris v. Commonwealth, 262 Va. 407, 551 S.E.2d 606 (2001), to be inconsistent with our analysis. In that case, the Commonwealth stipulated that the anonymous tip (alleging a suspected drug dealer was "armed”) was insufficient to justify a Terry stop, thus rendering the J.L. issue moot. Recognizing this, the Virginia Supreme Court stated: "Accordingly, we need not address that aspect of the Court of Appeals opinion.” Harris, 262 Va. at 414, 551 S.E.2d at 609. From there, Harris went on to address only the question whether the police officer had a reasonable suspicion that the suspect was trespassing. On that narrow issue, Harris held that the Commonwealth could not use a concededly invalid tip (concerning an "armed” drug dealer) to rehabilitate a Terry stop (based solely on a trespassing hunch) which itself lacked any reasonable suspicion of illegality. Nothing in the Virginia Supreme Court’s opinion in Harris, therefore, deals with the question whether the tip did or did not satisfy the J.L. standard. Our panel decision, Harris v. Commonwealth, 33 Va.App. 325, 533 S.E.2d 18 (2000), which was reversed on other grounds, found the tip in violation of J.L. This finding, however, does not contradict our analysis. The tip in Harris did not provide a reasonable basis for an officer to conclude that the tipster was an eyewitness reporting contemporaneous events, or that the suspect’s use of the weapon involved an *235 open and obvious illegality, or that the conduct presented an imminent danger to public safety.

. The Fourth Amendment ‘‘applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." Brown v. Texas, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (citations omitted); Wechsler v. Commonwealth, 20 Va.App. 162, 170, 455 S.E.2d 744, 748 (1995).

. Simply viewing a bulge, without any other indicia of dangerousness, does not permit the officer to conduct a weapons frisk. See Stanley v. Commonwealth, 16 Va.App. 873, 877, 433 S.E.2d 512, 514-15 (1993). But if other suspicious conduct exists, such as the suspect's attempt to conceal the bulge or similar circumstances suggesting danger, the *238 officer may perform a weapons frisk. See Troncoso v. Commonwealth, 12 Va.App. 942, 945, 407 S.E.2d 349, 350-51 (1991).